[No. S014664. Aug. 25, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
MARIO LEWIS GRAY, Defendant and Appellant.

COUNSEL

Mark A. Borenstein, under appointment by the Supreme Court; Tuttle & Taylor, John R. Dent, Jeffrey S. Karr; Overland & Borenstein and Julie M. Ruhlen for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Carol Wendelin Pollack, Marc E. Turchin and Pamela C. Hamanaka, Assistant Attorneys General, John R. Gorey, Susan D. Martynec, Susan L. Frierson, Keith H. Borjon and Robert David Breton, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WERDEGAR, J.—A jury in Los Angeles County Superior Court convicted Mario Lewis Gray in 1989 of first degree murder (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated), burglary (§ 459), robbery (§ 211), forcible rape (§ 261, subd. (a)), and forcible sodomy (§ 286, subd. (c)), all perpetrated against the person or home of victim Ruby Reed. The jury also sustained four special circumstance allegations in connection with these crimes: that defendant murdered Reed while engaged in the commission of burglary, attempted robbery, forcible rape, and forcible sodomy. (§ 190.2, former subd. (a)(17)(i), (iii), (iv) & (vii), now redesignated subd. (a)(17)(A), (C), (D) & (G).) In addition, the jury convicted defendant of six unrelated first degree burglaries. (§ 459.) On February 1, 1990, the jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

I. GUILT PHASE

A. Facts

1. April 23, 1987: Five Burglaries

Michael Barry lived with his wife in a trailer park on Lycoming Street in the City of Walnut. On the morning of April 23, 1987, around 5:30 or 6:00 a.m., he awoke and noticed the window on the door in the laundry room had been forced open and the door was ajar. He turned on the light and found his wife's purse emptied on the floor. Her wallet was missing about $20. Credit cards had been removed from the wallet but not taken.

Joan Darling lived alone in the same trailer park as Barry. She awoke around 4:00 a.m. the morning of April 23, 1987, because she heard a tapping

sound. She went to investigate but found nothing and went back to sleep. She awoke again around 6:00 a.m. and noticed her purse had been emptied out and $40 in cash had been taken. Her credit cards and a ring were not taken. Someone had pried open the window of her back door. The intruder had left a used cigarette and a flashlight in her home.

Barbara Hostetler lived with her husband and son in the same trailer park as Barry and Darling. She did not notice anything amiss when she left for work at 5:30 a.m. on April 23, 1987. Her son left 10 minutes after her. Around 7:00 a.m., her husband called her and she returned home, whereupon she noticed someone had opened the closet in the guest room and had moved things around on the desk. Her husband's billfold was open, and papers were strewn about. The screen on the window in her son's room had been removed. Her husband testified he awoke around 6:00 a.m. when his dog began growling as if someone were in the home. When he went to investigate, he saw no one but found the sliding door wide open. His wife would not have left that door open. He also found a window screen had been removed. His billfold had been emptied of $4 or $5, and some change was also missing, although the thief left his credit cards. Dwight Hostetler, Barbara's son, testified he did not remove the screen from the window and that it had been in place when he left for work early that morning. Police later discovered defendant's fingerprints on the removed window screen.

Kathryn Patchin lived in the same trailer park as Barry, Darling, and the Hostetlers. She awoke around 5:30 a.m. on April 23, 1987, because her pet cockatiel began speaking. Patchin, believing her daughter had come home from work early, called out and went into the next room. She noticed the door to the utility room, which had been open when she went to sleep, was now closed. When she went to open it, she heard a sound as if someone were falling on her washing machine. She opened the door just as someone else was closing the door to the outside. She did not see the intruder. Her credit cards were strewn on top of the washing machine, although none were missing. Her purse was open and her attaché case unzipped. She was missing around $30.

Letitia Larson lived on Lycoming Street with her parents, husband, and son in a home across the street from the trailer park. On April 23, 1987, she got up around 6:30 a.m. and noticed her husband's gym bag had been emptied out and the bag taken. A camera on the table had not been taken. A window in the laundry room was open, the wood around the window chipped, and the screen torn. The window had been closed before she went to sleep. The night before, her father, Eugenio Lozano, had ensured the doors and windows were locked.

## 2. *April 25, 1987: The Crimes Against Ruby Reed*

Eighty-seven-year-old Ruby Reed lived alone in a trailer park in El Monte, which was adjacent to the RTD bus terminal. Her daughter, Margaret Pemberton, lived in the same trailer park. Pemberton visited her mother every day and last saw her around 6:00 p.m. on April 24, 1987. Residents in nearby trailers later reported suspicious circumstances occurring during the early morning hours of April 25. One testified her dog began making odd growling noises. Another testified someone had stolen some cigarettes and a cigarette lighter she had left on an outdoor patio table. Others reported hearing noises, including a woman screaming for help.

Pemberton returned to her mother's trailer around 11:00 a.m. on April 25. No one answered when she rang the bell. Pemberton walked to the back and found the back door ajar and a window screen pried loose. On entering through the back door, she found her mother, covered in bedding, lying on the bedroom floor. Police and emergency personnel were called, but the victim was pronounced dead at the scene. Her hands and feet had been bound with nylon stockings, and strips of towels were tied around her head and mouth, attached to her face with tape. Her nightgown had been pulled to the top of her body, and her underwear was around one leg. Her false teeth were on the floor. Money was missing from her home, which had been ransacked, with jewelry boxes and shoe boxes opened and scattered about. Cigarette ashes were left in the home, although Reed did not smoke. Candy wrappers were strewn about the home, whereas Pemberton testified her mother would have placed the wrappers in a wastepaper basket.

Dr. Solomon Riley, a deputy medical examiner, testified that Reed had suffered blunt trauma to her face, both sides of her head, her neck, and her chest. Her jaw was broken on both sides of her head, and she had two broken ribs on her left side and one broken rib on her right side. These injuries were consistent with her having been kicked, punched, or thrown into a blunt object. She had severe bruising around her eyes, suggesting she had been hit around the eyes. She had injuries to her scalp and bleeding on her brain. Her neck had been compressed for four or five minutes, causing facial swelling and, eventually, death by asphyxiation. Dr. Riley suggested the assailant had pressed his elbow, knee, or forearm on the victim's neck, or had possibly placed a two- by-four piece of wood on her neck and then pressed on it, breaking the hyoid bone at the base of her tongue in the process.

In a laundry basket at the crime scene, police found two key pieces of evidence: (1) a room receipt from the Frontier Hotel in downtown Los Angeles dated April 24, 1987, bearing the names of "Lewis Gray" and "Gregory Gray" and signed by one "Lewis Gray"; and (2) an RTD bus

transfer. The fingerprint on the hotel receipt belonged to defendant. Further investigation showed that defendant—apparently attempting to conceal his identity—had checked *out* of the Frontier Hotel at 8:01 a.m. on April 25 (the morning of Reed's murder), signing the receipt as "Lewis Gray," but evidently unwilling actually to leave the hotel, he had three minutes earlier (at 7:58 a.m.) checked *into* the same hotel under the name of "Mario Davis."

Later in the morning of April 25, after he killed Reed, defendant took a further step to create a new identity for himself. Evidence showed that on that morning he took a bus to the University of Southern California Medical Center and, at 11:20 a.m., sought and received from the hospital an identification card in the name of "Mario Davis." An expert testified the handwriting on the hotel check-out receipt (Lewis Gray) and the check-in receipt (Mario Davis), and defendant's handwriting exemplars were all written by the same person.

Investigation of the bus transfer found in Reed's home showed it had been issued from a bus on line 70, which originated in downtown Los Angeles, where the Frontier Hotel was located, and terminated at the bus station in El Monte. The transfer was valid only on local El Monte buses. As punched by the bus driver, the transfer was valid until 4:20 a.m. on April 25, 1987, meaning it was probably punched around 3:20 a.m. that day. A No. 70 bus driven by driver Aemberti had arrived at the El Monte bus station around 3:15 a.m. on April 25, 1987. The specific punch Aemberti was using that day matched the punchmarks on the bus transfer found at the crime scene.

Local buses in El Monte ran along Garvey Avenue, near the home of Cozette Gray, one of defendant's sisters. Cozette Gray's home was only 1.7 miles from Reed's home.

Elizabeth Kornblum, the prosecution's serologist, testified she had tested swabs from the sexual assault kit and detected the presence of spermatozoa in Reed's vagina, rectum, and external genitalia. She also found semen present on the victim's underwear. Based on chemical and enzymatic markers found in the semen, two in 10,000 White males could have been the donor, whereas approximately one in 100 African-American males could have been the donor. Defendant, who is African-American, was a member of the group of possible donors. Gerald Burke, a criminalist with the sheriff's department, testified that two of three pubic hairs found in the victim's anal region were consistent with defendant's pubic hair and inconsistent with the victim's hair.

Aaron Cansadillas testified he was a close friend of defendant's sister Cozette Gray and had visited her house often in April 1987. It was there he met defendant. Cansadillas told police that one morning in April 1987, when

he was at Cozette's house, defendant arrived and said he had broken into a home, that "there was a lady in there," and he had to "shut her up." Cansadillas recanted this statement at trial and was impeached with his prior statement, in which he also reported that defendant did not seem upset about the events.

### 3. *April 28, 1987: A Final Burglary and Defendant's Capture*

Kim Meldrum lived in an apartment in Covina. On April 28, 1987, three days after the crimes against Reed, Meldrum left for work in the early morning, locking the door behind her. When she returned, she discovered someone had been in her apartment. Her bank statement and cancelled checks were scattered around the floor and a screwdriver that did not belong to her was on her stovetop. The screen for her front window had been removed and was on the ground, leaning on the wall.

Kim Edwards lived across the courtyard from Meldrum. She awoke when she heard a gate slam at 4:15 a.m. She went to investigate and saw defendant walking in the apartment complex. He stopped in front of Meldrum's apartment and rang the doorbell several times. Receiving no answer, he began prying the screen off her front window and then forced the window open. Edwards called the police, who came and surrounded the apartment. Defendant tried to escape through the rear of the apartment but retreated back into it when he saw a police officer. He eventually surrendered to police and gave his name as "Mario Davis."

When questioned on April 29, defendant denied knowing anything about the murder or the Frontier Hotel receipt, and he professed not to remember where he was on the night of April 24–25.

### 4. *The 1983 Crimes Against J.S. and S.B.*

Defendant's 1983 crimes against J.S. and S.B. were admitted to show the identity and intent of the perpetrator of the crimes against Reed. J.S., 64 years old at the time of defendant's capital trial, testified that on February 6, 1983, she was sleeping in her apartment with her eight-year-old granddaughter, S.B., when she heard someone open a drawer in her bedroom and smelled cigarette smoke. She awoke to find defendant in her room. He instructed her not to make any noise, gesturing in a way that led her to believe he had a weapon. He took her to the next room, where he tore a towel into three strips which he used to bind her. Once she was immobilized, defendant kicked her and she fell down. He tore up another towel and tied a strip around her head, covering her eyes. He then demanded she give him gold, money, and her wallet. He took $370 from her purse. He also took some rings, but they were

recovered in an alley where defendant had apparently discarded them. He ransacked her closet, removing and opening shoe boxes, leaving them strewn about on the floor.

While J.S. was helpless on the floor, she heard defendant turn on the television and call someone on her telephone. He left the apartment through a window but soon returned. During this ordeal, defendant would kick J.S. and beat her with his fists. At some point, he removed his clothing and rubbed his penis on her neck. He also pushed her nightgown up to her belly. He then sat, naked, on her legs.

The noise from these activities awakened S.B. Defendant grabbed her and began to beat her as well. He then took S.B. back into the bedroom and directed her to orally copulate him. When she refused, he threatened to hurt her grandmother. S.B. then orally copulated him for a few seconds before they heard a sound in the next room.

While defendant was in the bedroom with her granddaughter, J.S., her hands still tied behind her back, clambered up on the sofa and attempted to escape through the window defendant had opened from the outside. He emerged from the bedroom and tried to prevent the escape, grabbing her by the mouth. She bit him and he let her go, causing her to fall into the alley, breaking her leg. Defendant then fled with his clothes, leaving behind a raincoat and some screwdrivers, keys, and cigarettes.

The ordeal lasted about three hours. Police later found candy wrappers strewn around the apartment. Police found defendant's right palm print on a light bulb at the crime scene. Defendant eventually pleaded guilty to burglary and was sentenced to six years in prison.[1]

B. *Pretrial Issues*

1. *Alleged* Wheeler *Error*

 Defendant contends the prosecutor violated his state and federal constitutional rights by using peremptory challenges to excuse two prospective jurors because they were African-American. (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*); *Batson v.*

---

[1] In connection with this 1983 incident, defendant was charged with robbery, burglary, oral copulation with a child under 14, and lewd conduct with a child under 14. He pleaded guilty to first degree burglary and was sentenced to the upper term of six years in state prison. The other charges apparently were dismissed.

*Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*).)[2] " 'In [*Wheeler*] . . . we held that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. Subsequently, in [*Batson*,] . . . the United States Supreme Court held that such a practice violates, inter alia, the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 116 [109 Cal.Rptr.2d 31, 26 P.3d 357].) As we explain, we find no *Wheeler/Batson* error.

### a. *Juror R.H.*

As is usual in capital cases, the pool of prospective jurors was reduced in number by excusing jurors for hardship; the remaining jurors then filled out a lengthy written questionnaire. These remaining jurors were then subjected to an oral voir dire examination by the court and the attorneys concerning their impartiality and their views on the death penalty. Following voir dire, the parties exercised challenges for cause and excused jurors were replaced. Once the panel was passed for cause, the parties began exercising peremptory challenges in alternating turns, beginning with the prosecution.

In this final round, when the prosecutor exercised his third peremptory challenge asking that Juror R.H. be excused, defense counsel made a *Wheeler* motion. In support of his motion, defense counsel first noted that defendant is African-American, the murder victim, Ruby Reed, was White, and the panel of approximately 100 prospective jurors had eight African-Americans. Counsel explained: "[E]xcusing [Juror R.H.] then obviously causes one less Black juror to be on the panel." Counsel continued, explaining that, from a prosecutorial perspective, nothing about Juror R.H. was objectionable. The juror was born and raised in British Guyana, was older (75 years old), a Republican, Catholic, had worked with the Department of Defense, and held moderate views on the death penalty. "[He] did not say in his [responses concerning the] death penalty whether he was for or against [it], but his questioning in front of the court was he was for the death penalty and he grew up where the death penalty existed which I believe is British Guyana. I believe his wife's son is captain of police." There being no apparent reason to challenge Juror R.H., counsel argued he had been challenged because of his race.

---

[2] Although defendant did not specifically cite *Batson*, *supra*, 476 U.S. 79, or the federal equal protection clause as a basis of his motion to quash the venire, these federal issues were properly preserved for appeal. (*People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

Although the trial court made clear it had not yet ruled on whether or not defendant had made a prima facie showing of group bias, the prosecutor suggested the juror's Catholic background was relevant to his decision, noted that the panel still had an African-American juror, suggested that something in the death-qualifying process led him to believe Juror R.H. was less than suitable, and observed that Juror R.H. was just the third juror he had excused with a peremptory challenge, his first two peremptory challenges having been exercised against a middle-aged man from Hawaii and a middle-aged White woman. In rebuttal, defense counsel reiterated that Juror R.H. did not appear to be against the death penalty and seemed to be a conservative person. The trial court stated it had not considered the prosecutor's reasons in determining whether defendant had made a prima facie showing of group bias and then denied the *Wheeler* motion, explaining that it did "not appear to the court the threshold has been reached of [an] invidious pattern of exclusion of a particular class." The 12 regular jurors eventually were chosen; included on the panel was an African-American woman.

### b. *Juror B.J.*

Once the panel of 12 prospective jurors was accepted by both sides, selection of alternate jurors began. During the selection of the alternate jurors, the prosecutor exercised his first three peremptory challenges against an apparently Latina woman and two White jurors. When the prosecutor then challenged Juror B.J., defense counsel made his second *Wheeler* motion, explaining Juror B.J. "is the [fourth] Black prospective juror to be called and the second to be excused by the prosecution." The court confirmed this count, noting that two African-American jurors had been called as regular jurors and two as alternates, and that the prosecutor had exercised a peremptory challenge against one of the African-American regular jurors, Juror R.H. Defense counsel opined that Juror B.J. held moderate views concerning the death penalty, believed that the penalty should be used more frequently and for people who intentionally kill another, and stated that she would judge the case on the evidence presented. The trial court denied the *Wheeler* motion, citing legal authorities suggesting that a movant fails to establish a prima facie showing of group bias "especially where another member of a noncomprisable [*sic*: cognizable?] group was left on the jury and the trial court found challenges were reasonable." Eight alternate jurors were eventually chosen, including one African-American. Two of the alternate jurors ultimately served. (See *People v. Roldan* (2005) 35 Cal.4th 646, 703 [27 Cal.Rptr.3d 360, 110 P.3d 289] [unnecessary to address *Wheeler* issue for alternate jurors if no alternates served on the jury].)

### c. *Discussion*

■ The United States Supreme Court recently reiterated the applicable legal standards. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted; see *People v. Cornwell* (2005) 37 Cal.4th 50, 67–68 [33 Cal.Rptr.3d 1, 117 P.3d 622] (*Cornwell*).)

■ In order to make a prima facie showing, "a litigant must raise the issue in a timely fashion, make as complete a record as feasible, [and] establish that the persons excluded are members of a cognizable class." (*People v. Boyette* (2002) 29 Cal.4th 381, 422 [127 Cal.Rptr.2d 544, 58 P.3d 391].) The high court recently explained that "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson v. California, supra,* 545 U.S. at p. 170 [125 S.Ct. at p. 2417].) "An 'inference' is generally understood to be a 'conclusion reached by considering other facts and deducing a logical consequence from them.' " (*Id.* at p. 168, fn. 4 [125 S.Ct. at p. 2416, fn. 4].)

■ We explained in *People v. Howard* (1992) 1 Cal.4th 1132, 1155 [5 Cal.Rptr.2d 268, 824 P.2d 1315], that when a trial court denies a *Wheeler* motion finding the objector failed to make a prima facie case of group bias, the reviewing court should consider the entire record of voir dire of the challenged jurors. (See *People v. Davenport* (1995) 11 Cal.4th 1171, 1201 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) That view is consistent with the high court's recent reiteration of the applicable rules, which require the defendant to attempt to demonstrate a prima facie case of discrimination based on the "totality of the relevant facts." (*Johnson v. California, supra,* 545 U.S. at p. 168 [125 S.Ct. at p. 2416].)

■ Applying these rules, we conclude the trial court properly found defendant failed to make a prima facie case of racial bias motivating the prosecutor's challenges to Jurors R.H. and B.J. At the outset, defendant contends the trial court applied the wrong standard. *Wheeler* states that, in order to make a prima facie case, an objector must show "a strong likelihood" of bias (*Wheeler, supra,* 22 Cal.3d at p. 280), and the trial court, from the objector's evidence, must "determine whether a reasonable inference [of bias]

arises" (*id.* at p. 281). This court subsequently held that "*Wheeler*'s terms 'strong likelihood' and 'reasonable inference' state the same standard" (*People v. Johnson* (2003) 30 Cal.4th 1302, 1313 [1 Cal.Rptr.3d 1, 71 P.3d 270]) and that "to state a prima facie case, the objector must show that it is *more likely than not* the other party's peremptory challenges, if unexplained, were based on impermissible group bias" (*id.* at p. 1318, italics added). The high court recently rejected that holding, explaining that "California's 'more likely than not' standard is an inappropriate yardstick by which to measure the sufficiency of a prima facie case" (*Johnson v. California, supra*, 545 U.S. at p. 168). Instead, an objector need only present facts that give " 'rise to an inference of discriminatory purpose.' " (*Ibid.*)

The trial court here failed to state what standard it was applying. As in *Cornwell*, however, "[r]egardless of the standard employed by the trial court, . . . we have reviewed the record and, like the United States Supreme Court in *Johnson* [*v. California*], *supra*, . . . [we] are able to apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror on the basis of race." (*Cornwell, supra*, 37 Cal.4th at p. 73.) We conclude the record does not support such an inference.

That Prospective Jurors R.H. and B.J., both African-Americans, belonged to a cognizable class is not disputed on appeal (*People v. Clair* (1992) 2 Cal.4th 629, 652 [7 Cal.Rptr.2d 564, 828 P.2d 705]),[3] nor does either party dispute that the issue was timely raised and the record is as complete as was feasible. Defendant relies on certain facts that, he claims, raise an inference of discriminatory intent. He first contends "[t]he almost total absence of Black jurors suggests that [Jurors R.H. and B.J.] were improperly excluded." Defendant overstates the case. The prosecutor excluded one African-American juror from the regular jury, but left another on, and struck one African-American from the panel of alternates, but left another on. As defendant concedes, the regular jury was composed of nine White jurors, one African-American juror, and two Latino jurors. The panel of eight alternate jurors was composed of six White jurors, one African-American, and one Latino juror. After examining "the totality of the relevant facts" (*Johnson v. California, supra*, 545 U.S. at p. 168 [125 S.Ct. at p. 2416]), we conclude the exclusion of two African-American jurors and the retention of two failed to

---

[3] At trial, the prosecutor argued *Wheeler* did not apply to Juror R.H. because the juror was born and grew up in British Guyana in South America. The trial court did not rely on this fact in making its ruling, and respondent does not now rely on that argument in this court. Rightly so: "In *Wheeler*, we imposed no requirement that the defendant establish that systematically excluded black jurors were of Afro-American, Caribbean, African or Latin American descent." (*People v. Trevino* (1985) 39 Cal.3d 667, 687 [217 Cal.Rptr. 652, 704 P.2d 719], overruled on other grounds in *People v. Johnson* (1989) 47 Cal.3d 1194, 1219 [255 Cal.Rptr. 569, 767 P.2d 1047].)

raise an inference of racial discrimination. (*People v. Box* (2000) 23 Cal.4th 1153, 1188–1189 [99 Cal.Rptr.2d 69, 5 P.3d 130] [that all excluded jurors were African-American is not necessarily dispositive in establishing a prima facie case]; *People v. Davenport, supra,* 11 Cal.4th at p. 1201 [showing that "three of the six challenged prospective jurors had Hispanic surnames" was "insufficient"].)

Defendant also argues the prosecutor's decision to excuse two of the six African-Americans in the venire of itself suggests bias. When the prosecutor challenged Juror R.H., of course, that juror was only one of three peremptory challenges the prosecutor had thus far exercised. The trial court did not know whether the prosecutor would remove additional racial minorities from the jury. Moreover, as noted, *ante,* although the prosecutor eventually challenged and had removed from the panel a total of two African-Americans, two more remained. We conclude the removal of two African-American jurors in these circumstances failed to raise a reasonable inference of racial discrimination. (See *People v. Snow* (1987) 44 Cal.3d 216, 225 [242 Cal.Rptr. 477, 746 P.2d 452] [that the prosecutor accepted a jury containing minorities "may be an indication of the prosecutor's good faith in exercising his peremptories, and may be an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection, [although] it is not a *conclusive* factor"].)

Although the trial court, in ruling on defense counsel's first *Wheeler* motion, stated it had not considered the prosecutor's explanation of his challenge to Juror R.H., defendant argues the prosecutor's volunteered reasons were unsupportable and, by inference, masked a forbidden motive. Defendant observes that although the prosecutor suggested Juror R.H.'s age (75), Catholic upbringing, and the fact he was not born in the United States were all relevant factors, he failed to challenge other jurors having similar characteristics. Defendant also argues the prosecutor's reliance on the fact Juror R.H. was raised in a different country and culture was pretextual because he did not rigorously question the juror on this topic. Finally, defendant contends that, although the prosecutor seemed concerned that Juror B.J.'s child care obligations might render her a less than desirable juror, the prosecutor objected to granting a hardship excusal to certain White jurors who had similar child care issues.

■ In raising this argument, defendant would have this court compare Jurors R.H. and B.J. with other jurors—those who served and those whom the prosecutor excused—to determine whether the prosecutor's reasons were applied consistently to jurors of all races. The United States Supreme Court recently held that an appellate court should scrutinize a prosecutor's reasons for exercising his or her peremptory challenges and determine whether those reasons were applied equally to other jurors, in order to assess the credibility

of the prosecutor's expressed motivations. (See *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] (*Miller-El*).) In *Miller-El*, the trial court found the defendant had made a prima facie case of discrimination, thus requiring the prosecutor to state the reasons for his challenges to specific jurors. After hearing from the prosecutor, the trial court proclaimed his stated reasons were " 'completely credible [and] sufficient' " and denied the motion. (*Miller-El*, *supra*, 545 U.S. at p. 236 [125 S.Ct. at p. 2323].) After conducting a comparative juror analysis, the high court reversed.

*Miller-El* thus involved a case in the third stage of a *Wheeler/Batson* motion, that is, after the trial court has found a prima facie showing of group bias, the burden has shifted to the prosecution, and the prosecutor has stated his or her reasons for the challenges in question. *Miller-El* holds that at this third stage, after the prosecutor has proffered his or her reasons, an appellate court should compare those reasons with the prosecutor's actions with respect to other jurors to determine whether the reasons given were pretextual. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Miller-El*, *supra*, 545 U.S. at p. 241 [125 S.Ct. at p. 2325].) *Miller-El* thus did not consider whether an appellate court must conduct a comparative juror analysis in the first instance, when the objector has failed to make a prima facie showing of discrimination, or whether an appellate court must conduct a comparative juror analysis for the first time on appeal, when the objector failed to do so at trial. As we explain, even if we were to compare the challenged jurors with jurors who were not excused, we would not find a prima facie showing of group bias existed. (See *Cornwell*, *supra*, 37 Cal.4th at pp. 71–72; *People v. Ward* (2005) 36 Cal.4th 186, 203 [30 Cal.Rptr.3d 464, 114 P.3d 717].) At the outset, we reiterate that we rely on and defer to our trial courts to distinguish bona fide reasons from the shams that hide improper motives (*People v. Boyette*, *supra*, 29 Cal.4th at p. 422), and that a party may decide to excuse a prospective juror for a variety of reasons, finding no single characteristic dispositive. Here, the prosecutor did not excuse an unusually high percentage of African-Americans from the venire, nor a particularly high number of African-Americans as compared to jurors of other races. At the time the prosecutor excused Juror R.H., he had already excused Juror C.H., who apparently was Japanese-American, and Juror J.R., who was White, and he had passed on challenging Juror D.W., an African-American woman who eventually served on the jury. By the time the prosecutor used a peremptory challenge to excuse Juror B.J., he had excused a number of non-African-American prospective jurors. Unlike in *Miller-El*, *supra*, 545 U.S. at page 241 [125 S.Ct. at p. 2325], therefore, here the "bare statistics" of the prosecutor's use of his peremptory challenges do not suggest a racial animus.

Although defendant argues the prosecutor's concern about Juror R.H.'s age was pretextual, we note it was defense counsel, not the prosecutor, who mentioned Juror R.H.'s age, speculating that this factor was important to the prosecutor's decision to challenge Juror R.H. But even if the prosecutor did rely on Juror R.H.'s age, the claim of pretext fails. The two non-African-American jurors of comparable age the prosecutor failed to challenge (Juror J.H., 75 years old, and Juror L.P., 71 years old) could both have been seen as pro-prosecution despite their age. Juror J.H. had previously served as a juror in a trial in which the defendant was charged with a double-murder; J.H. reported that jury had reached a verdict. Juror L.P. had previously testified in a criminal case and reported that she had been treated "kindly" by both the trial judge and the prosecutor. Moreover, Juror L.P. stated in her juror questionnaire that her support for the death penalty was "strong," that she agreed "very strongly" with the idea of retributive justice ("an eye for an eye"), and that "too many murderers [were] lightly sentenced." The prosecutor may well have believed that, despite their age, both jurors would look favorably on his case. In short, the prosecutor's alleged disparate treatment of older African-American and non-African-American jurors does not suggest a prohibited racial motivation.

Defendant also contends the prosecutor's reliance on Juror R.H.'s Catholicism[4] was pretextual, noting that five other non-African-American Catholic jurors were not similarly challenged. Assuming without deciding we can consider the prosecutor's volunteered reasons when the trial court did not, we find the prosecutor did not clearly rely on Juror R.H.'s Catholicism. Although the prosecutor began his voluntary explanation of his decision to strike Juror R.H. by mentioning Catholicism, when he resumed his recitation after an interruption, he did not return to the juror's Catholicism, but instead stated he struck him because he was born into a different culture in British Guyana.

Even were we to assume that the prosecutor did rely on Juror R.H.'s Catholicism, a side-by-side comparison of Juror R.H. with the other Catholic jurors who were not excused,[5] reveals clear reasons why the prosecutor may have preferred not to strike the other jurors. Juror G.F.'s husband was a California Highway Patrol officer; the prosecutor may have believed she

[4] In recounting the prosecutor's statement in support of his peremptory challenge of Prospective Juror R.H., we do not mean to suggest our approval, tacit or otherwise, of a practice of excluding jurors on the basis of religious affiliation. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 115 [36 Cal.Rptr.2d 474, 885 P.2d 887] [dictum]; *Wheeler, supra*, 22 Cal.3d at p. 276 [same].) Defendant did not object on this ground, however, and the trial court properly found no prima facie showing of group bias on the ground—race—that was presented.

[5] Defendant is incorrect as to one juror. Juror J.T., who reported in his questionnaire that he was Catholic, was in fact challenged by the prosecutor and excused.

would thus be a favorable juror for the People. Based on his juror question-naire, Juror J.P. had a fear his wife and children would be the victims of sexually based crimes; because defendant was charged with just such crimes, the prosecutor may have believed Juror J.P. would be a sympathetic juror. Juror D.G. reported her support for the death penalty was "strong," whereas Juror R.H. reported his support was just "moderate." Finally, Juror D.P. had previously served as a juror in a murder trial that reached a verdict, suggesting this juror might look favorably on the prosecutor's case. (By contrast, the prosecutor excused Juror C.S., who reported she had been a juror in a trial involving a charge of attempted murder that had resulted in a hung jury.)

Defendant also contends the prosecutor's asserted concern that Juror R.H. was born in British Guyana was pretextual because the prosecutor failed to exercise a peremptory challenge against Juror D.G. (who was born in Mexico), Juror H.F. (who was born in Germany), and Juror J.P. (who was born in Puerto Rico). The record discloses reasons the prosecutor may have decided to retain the other foreign-born jurors despite their foreign birth. Juror D.G. reported in her questionnaire that her support for the death penalty was "strong." Juror J.P., as noted, *ante*, had expressed a fear that his loved ones would become victims of sex crimes. Juror H.F. similarly reported that he feared his 21-year-old daughter would one day be raped. On this record, the prosecutor's reliance on Juror R.H.'s foreign birth does not appear pretextual.

Nor, contrary to defendant's argument, did the prosecutor engage in mere desultory or cursory voir dire questioning of Jurors R.H. and B.J. (See *People v. Farnam* (2002) 28 Cal.4th 107, 137 [121 Cal.Rptr.2d 106, 47 P.3d 988]; *Wheeler, supra*, 22 Cal.3d at pp. 280–281.) The prosecutor's question-ing of Juror R.H. was similar to that of other prospective jurors. Although defendant asserts the prosecutor asked Juror B.J. only one question,[6] this characterization ignores the prosecutor's lengthy questioning of the juror earlier in the voir dire process concerning her request for a hardship exemption due to her child care obligations, including the care of an autistic grandchild, and an even longer inquiry into her views on the death penalty, i.e., her *Hovey* voir dire. (See *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301].) Defendant's claim the prosecutor engaged in only cursory questioning of Jurors R.H. and B.J. is thus not supported by the record.

---

[6] The prosecutor asked her: "[T]he last time we were here you voiced some concerns to us. Are those still concerns to you?" She answered in the affirmative. We assume the prosecutor was referring to the juror's concern over her child care obligations.

Finally, defendant contends the prosecutor could have had no reason to excuse Juror B.J. except for the fact she had significant child care obligations. This reason, defendant argues, was pretextual because the prosecutor was unsympathetic to the hardship claims of other, non-African-American, jurors. Because the prosecutor was not called upon to provide reasons for his challenge to Juror B.J., defendant's argument is mere speculation.

In any event, an examination of the record indicates the prosecutor may well have exercised a peremptory challenge against Juror B.J. because she reported that someone close to her had been arrested and sent to jail for stealing a car. The prosecutor challenged other jurors who had had such experiences with law enforcement. Juror J.T. reported he had, in the past, been arrested for petty theft and felt he had been treated unfairly; the prosecutor excused him. Similarly, Juror C.S. reported an apparent family relation was then facing charges of assault and battery; the prosecutor excused her. Thus, the record contains plausible and credible reasons supporting the prosecutor's action. (See *Miller-El, supra*, 545 U.S. at p. 248 [125 S.Ct. at p. 2329] [addressing the "plausibility" of the prosecutor's reasons]; *id.* at p. 248 [125 S.Ct. at p. 2339] [noting the prosecutor's explanations were "incredible"].) We conclude the trial court correctly found that defendant failed to make a prima facie case that the prosecutor was motivated by group bias when he exercised peremptory challenges against Jurors R.H. and B.J.

## 2. *Alleged* Witherspoon/Witt *Error*

■ Defendant contends the trial court erred by excusing Jurors C.B. and L.T. due to their alleged views concerning the death penalty, thereby violating his right to an impartial jury under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The high court has established the legal standard for excusing jurors due to their views on the death penalty, first in *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], and then in *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]. In *Witt*, the Supreme Court explained that a prospective juror may be excused in a capital case if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.* at p. 424.) We apply the same standard under the state Constitution. (*People v. Jones* (2003) 29 Cal.4th 1229, 1246 [131 Cal.Rptr.2d 468, 64 P.3d 762].)

■ "There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror." (*People v. Jones, supra*, 29 Cal.4th at

pp. 1246–1247.) "Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be 'unable to faithfully and impartially apply the law in the case.' [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. [Citation.] '[W]here equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his true state of mind is binding on an appellate court.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 910 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

As is often the case, Jurors C.B. and L.T. gave conflicting and equivocal responses when, during voir dire, they were asked about their views on capital punishment. In her jury questionnaire, Juror C.B. reported that she had "strong" feelings about the death penalty because she did "not believe anyone but God has the right to decide that question." When initially questioned by defense counsel, she agreed that she would "live up to [her] obligation as a juror . . . [and] base [her] decision on the law and the evidence." When questioned by the trial judge and the parties, she initially stated that her views against the death penalty would "probably not" cause her to vote against the special circumstance allegation although convinced it was true. When asked whether she "would . . . always vote for life without possibility of parole and never even consider [voting] for death," she replied: "I don't know. I guess at this point I would say I don't know because I have never been in this position before." Following up, the court rephrased the question and asked her whether "you are always going to say life without possibility of parole and never vote for the death penalty?" She replied: "I don't think so." When questioned by the prosecutor, however, she reaffirmed that she had a "strong feeling" against the death penalty and first stated that she would have "a lot of trouble" voting for death, before agreeing that she "probably would" always vote for life over death.

The following colloquy then occurred:

"[THE PROSECUTOR]: . . . you in effect will be saying put this man to death, that's what you'll be saying, and what I need to find out is are your feelings about the death penalty such that you just could not make that kind of decision?

"[JUROR C.B.]: I'm going to say it is yes, yes.

"[THE PROSECUTOR]: So you feel that because of your moral feelings you could not vote to impose the death penalty?

"[JUROR C.B.]: Yes.

"[THE PROSECUTOR]: That's a correct statement?

"[JUROR C.B.]: Yes."

She was rehabilitated somewhat by defense counsel, agreeing that she could not definitively make up her mind until she had heard the actual aggravating and mitigating evidence. The trial court then excused her for cause. In light of her equivocal answers on voir dire, we defer to the trial court's implicit determination regarding Juror C.B.'s state of mind and conclude substantial evidence supports the court's ruling the juror's views on the death penalty would " 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.' " (*Wainwright v. Witt, supra,* 469 U.S. at p. 424.)

We reach the same conclusion with regard to Juror L.T.; indeed, her responses on voir dire were less equivocal. She reported on her questionnaire that she had strong feelings against the death penalty. When asked to explain, she wrote: "I don't believe in taking a life." Her strong anti-capital-punishment beliefs informed her responses to the trial court's questions, affirming that she "could never bring [herself] to vote for the death penalty" and would always vote for life without possibility of parole. Although she also asserted that "it depends on the case, too. I mean, what I hear might change my mind," she averred that she would "never vote for the death penalty." Although defense counsel rehabilitated her somewhat, the overall thrust of her voir dire was that she would never vote to execute someone. We find substantial evidence to support the trial court's ruling to excuse her and conclude the court did not abuse its broad discretion. In sum, we find neither Juror C.B. nor Juror L.T. was improperly excused for cause, and no violation of defendant's right to an impartial jury occurred.

### C. *Trial Issues*

#### 1. *Failure to Specify the Degree of the Murder*

Defendant contends that because the jury failed to set the degree of the murder when it initially delivered its verdict, he was convicted of only second degree murder by operation of section 1157. That section provides in pertinent part: "Whenever a defendant is convicted of a crime . . . which is distinguished into degrees, the jury . . . must find the degree of the crime . . .

of which he is guilty. Upon the failure of the jury . . . to so determine, the degree of the crime . . . of which the defendant is guilty, shall be deemed to be of the lesser degree." Because section 1157 precludes a finding of first degree murder, he argues, the felony-murder special-circumstance findings and the penalty judgment must be reversed. We disagree. As we explain, appellate review of this issue is precluded by the doctrine of law of the case. Moreover, assuming the issue were properly before us, section 1157 is inapplicable under the circumstances of this case, as we explained in both *People v. Bonillas* (1989) 48 Cal.3d 757 [257 Cal.Rptr. 895, 771 P.2d 844] (*Bonillas*) and *People v. Mendoza* (2000) 23 Cal.4th 896 [98 Cal.Rptr.2d 431, 4 P.3d 265] (*Mendoza*).

### a. *Facts*

Defendant was charged by information with the crime of murder undifferentiated by degree, as is usual in such cases. The case was tried on the theory that defendant had committed murder in the first degree because he killed the victim in the commission of a burglary, robbery, and rape.[7] Accordingly, the jury was instructed solely on the theory of first degree felony murder. The court delivered no instructions on the theory of premeditation and deliberation, second degree murder, manslaughter, or the degree of the murder.[8] On Wednesday, February 22, 1989, at 3:45 p.m., the jury returned the following verdict: "We the jury in the above-entitled action find the defendant Mario Lewis Gray guilty of murder in violation of Penal Code section 187(a), a felony, as alleged in Count I of the information." The jury was polled and then instructed to return on Friday morning, i.e., in less than two days. The court admonished the jury "not to discuss the case with each other or anybody else."

The next morning, Thursday, February 23, 1989, both the trial court and the prosecutor raised the jury's failure to expressly specify the degree of the murder in the verdict form. The prosecutor suggested that when the jury reconvened the following day, the court either poll the jurors to determine whether they had found the degree of the murder or ask them to resume deliberations to determine the degree. The court granted defense counsel's request for a recess to research the law on this issue. When the parties reassembled without the jury later that same day, defense counsel argued the

---

[7] At one point near the end of the guilt phase, the prosecutor asserted that he intended to request the jury be instructed on the theory of a deliberate and premeditated murder. The next day, he explained he had misspoken and that he intended to rely solely on the theory of felony murder.

[8] Defendant requested an instruction defining homicide as including murder "and manslaughter," but it was refused. Defendant did not request instructions on second degree murder or manslaughter, and the trial court noted that defendant declined to request CALJIC No. 8.70 regarding the degree of the murder.

jury's verdict of murder without setting the degree meant defendant was convicted of second degree murder by operation of section 1157. The trial court announced that it intended to ask the jury to renew its deliberations and render a verdict on the degree of the murder.

Court reconvened on the morning of Friday, February 24, 1989. The trial court gave the jury amended verdict forms and asked it to "return to the jury room, deliberate, and render your verdict as to Count 1 using the revised verdict forms." After additional deliberation, the jury returned a verdict of first degree murder. The court then declared a recess, ostensibly for one week, to enable defendant to seek writ relief from the Court of Appeal. The appellate court stayed the trial proceedings and then granted writ relief in defendant's favor, finding he had been convicted of second degree murder by operation of section 1157. Respondent then petitioned this court for review. We granted and transferred the case back to the Court of Appeal with directions to vacate its opinion and reconsider the case in light of *Bonillas*, *supra*, 48 Cal.3d 757. After reconsidering the issue, the Court of Appeal issued an opinion denying relief. We denied defendant's petition for review. The parties then returned to the trial court and proceeded to commence the long-delayed penalty phase of the trial.

b. *Law of the Case*

██ As noted, the Court of Appeal decided 11 years ago that, despite the jury's initial omission when rendering its verdict, section 1157 did not compel the conclusion that defendant was convicted of murder only in the second degree. Accordingly, defendant is precluded from relitigating the issue by the doctrine of law of the case. " 'The rule of "law of the case" generally precludes multiple appellate review of the same issue in a single case. The doctrine applies to this court even though the previous appeal was before a Court of Appeal. . . . "Where a decision upon appeal has been rendered by a District Court of Appeal and the case is returned upon a reversal, and a second appeal comes to this court directly or intermediately, for reasons of policy and convenience, this court generally will not inquire into the merits of said first decision, but will regard it as the law of the case." [Citations.]' " (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 668 [128 Cal.Rptr.2d 104, 59 P.3d 174].)

██ "The principal reason for the doctrine is judicial economy. 'Finality is attributed to an initial appellate ruling so as to avoid the further reversal and proceedings on remand that would result if the initial ruling were not adhered to in a later appellate proceeding.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 786 [42 Cal.Rptr.2d 543, 897 P.2d 481] (*Stanley*); see also *People v. Shuey* (1975) 13 Cal.3d 835, 841–842 [120 Cal.Rptr. 83, 533 P.2d

211].) The law of the case doctrine applies in criminal cases (*Stanley, supra*, at p. 786) and to capital cases before this court even where the prior decision was made by an intermediate appellate court (*id.* at p. 787; *People v. Martinez* (2003) 31 Cal.4th 673, 683 [3 Cal.Rptr.3d 648, 74 P.3d 748]).

 We will apply the law of the case doctrine where the point of law involved was necessary to the prior decision and was " 'actually presented and determined by the court.' " (*People v. Shuey, supra*, 13 Cal.3d at p. 842.) The doctrine will not be applied, however, when such application leads to an unjust result. Because the law of the case doctrine "is merely one of procedure and does not go to the jurisdiction of the court [citations], the doctrine will not be adhered to where its application will result in an unjust decision, e.g., where there has been a 'manifest misapplication of existing principles resulting in substantial injustice' [citation], or the controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations [citation]. The unjust decision exception does not apply when there is a mere disagreement with the prior appellate determination." (*Stanley, supra*, 10 Cal.4th at p. 787.)

Defendant does not dispute that the question whether section 1157 applies to the facts of his case was presented to, and decided by, the Court of Appeal, or that resolution of the issue was necessary to that court's decision. He argues, however, that we should apply the "unjust result" exception to the law of the case doctrine because (1) the Court of Appeal decision contained "egregious errors," and (2) it would be unjust to affirm, in the name of judicial economy, a sentence of death containing serious flaws.

 Defendant's argument that the Court of Appeal committed "egregious errors" when it decided the issue is a spare one with no elaboration. Thus, that the court "adopted as the rationale of its majority opinion the very argument that it had recognized as insufficient only five months earlier" is easily explained by the fact that this court vacated the appellate court's initial opinion and directed it to reconsider the issue in light of *Bonillas, supra*, 48 Cal.3d 757. Defendant does not explain how the Court of Appeal "[f]undamentally misconstrued Penal Code sections 1161 and 1164,"[9] but the court's reasoning appears congruent with our own in *Bonillas*. Although defendant

---

[9] Section 1161 states in pertinent part: "When there is a verdict of conviction, in which it appears to the Court that the jury have mistaken the law, the Court may explain the reason for that opinion and direct the jury to reconsider their verdict . . . ."

Section 1164, subdivision (a) states: "When the verdict given is receivable by the court, the clerk shall record it in full upon the minutes, and if requested by any party shall read it to the jury, and inquire of them whether it is their verdict. If any juror disagrees, the fact shall be entered upon the minutes and the jury again sent out; but if no disagreement is expressed, the verdict is complete, and the jury shall, subject to subdivision (b), be discharged from the case."

accuses the Court of Appeal of "ignor[ing] adverse precedent that it could not distinguish, even through mischaracterization," defendant does not identify such allegedly adverse precedent. We remind litigants that an opening brief must support each legal point with "argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 14(a)(1)(B); see *Stanley, supra,* 10 Cal.4th at p. 793.)

Defendant also argues that applying the law of the case doctrine here would be unjust because his very life should not be subordinated to the institutional interest of judicial economy. This contention is simply a repackaging of the argument that the doctrine should not apply in capital cases. As noted, we have rejected that position. (*Stanley, supra,* 10 Cal.4th at p. 787.)

Assuming the "unjust result" exception does not apply here, defendant also contends that, because this is a capital case, application of the doctrine would deprive him of his state constitutional right to a direct appeal to this court (see Cal. Const., art. VI, § 11 ["The Supreme Court has appellate jurisdiction when judgment of death has been pronounced"]), as well as deprive him of due process under the Fifth and Fourteenth Amendments to the United States Constitution. We reject this argument because it also reiterates, in only slightly different fashion, the argument that the law of the case doctrine should not apply in capital cases. (*Stanley, supra,* 10 Cal.4th at p. 787.) Defendant further argues *Stanley* and the cases on which it relied are distinguishable because, unlike those cases, his life or death depends directly on whether the lower appellate court was correct, whereas in prior cases, the effect of the legal issue in question on the efficacy of the death penalty was only indirect. *Stanley,* however, relied on no such direct/indirect distinction. The provision in the state Constitution for the automatic appeal to this court for capital cases presumably reflects the relative importance of such cases generally, not whether a particular defendant's life hangs in the balance on the outcome of any specific legal issue. We reiterate that the existence of a death sentence is insufficient to avoid application of the law of the case doctrine, and defendant does not persuade us otherwise.

█ Failing to distinguish *Stanley, supra,* 10 Cal.4th 764, defendant argues we should reconsider that case "since the necessary consequence of that decision is to deprive [him] of his state and federal constitutional rights." Although it is true that automatic review by the state's highest court provides an important procedural safeguard in capital cases (see *Gregg v. Georgia* (1976) 428 U.S. 153, 198 [49 L.Ed.2d 859, 96 S.Ct. 2909]), the rule we reiterate and adhere to today does not undermine the importance of automatic review. This court was not locked out of the midtrial proceedings that sought to determine whether the degree of the murder should be reduced by section 1157. Indeed, we reviewed the matter twice, once on a petition by the People,

and again in response to a petition by defendant. Moreover, if application of the law of the case doctrine would lead to an unjust result here, we would decline to apply it. Under the circumstances, the rule set forth in *Stanley*, *supra*, 10 Cal.4th at page 787, does not result in the removal of this court's review of capital cases in any meaningful sense.

In sum, defendant's attempt to relitigate this issue is barred by the law of the case doctrine.

### c. Bonillas *and* Mendoza

Even assuming for argument the law of the case doctrine does not apply, we find the trial court did not err in resubmitting the question of the degree of the murder to the jury because the trial court retained control over the jury and resubmitted the question almost immediately. We addressed this precise issue in *Bonillas*, *supra*, 48 Cal.3d 757, which posed almost identical facts. We explained: "Where, as here, further proceedings are to take place, the jury has not been discharged, the jurors have been specifically instructed that they are still jurors in the case, they have been admonished not to discuss the case with anyone nor to permit anyone to discuss the case with them, and they have been directed not to read anything about the case, the jurors have not thrown off their character as jurors nor entered the outside world freed of the admonitions and obligations shielding their thought processes from outside influences. Clearly, the jury here remained within the court's control [citations], their verdict was incomplete, and the court was authorized to reconvene the jury to complete its verdict." (*Id.* at p. 773.)

Defendant attempts to distinguish *Bonillas*, but he raises the same arguments he made before the Court of Appeal in his pretrial writ proceeding. Thus, he first argues *Bonillas* was premised on the fact the jury's verdict contained an error because it was "incomplete." Here, by contrast, the information did not charge him with first degree murder, nor did the instructions specifically require the jury to make a finding as to degree; hence, his jury's initial verdict was "complete" under the instructions given and under the law.

We agree with the Court of Appeal, which observed that although *Bonillas* used the terms "incomplete" and "irregular" somewhat loosely, it did not pronounce a rigid rule excepting from the operation of section 1157 only those cases where the initial verdict is "incomplete" as measured by what the instructions asked the jury to decide. In any event, as the appellate court explained, on the facts of this case, the jury's verdict was in fact incomplete because the instructions, read as a whole, fairly asked the jury to return a verdict as to degree. Thus, the jury was subject to reconvening under

*Bonillas*. Moreover, even if the verdict was complete under the jury instructions, it was still incomplete and irregular under the law, justifying the trial court's decision to reconvene the jury for further deliberations, so long as the jury had not been discharged and had been admonished not to discuss the case or read any news accounts of the case.[10]

Even were we to conclude *Bonillas* could be validly distinguished, adherence to the rule announced recently in *Mendoza, supra,* 23 Cal.4th 896, requires that we reject defendant's arguments. In that case, we clarified the proper interpretation of section 1157 in felony-murder cases, explaining that where the prosecution's sole theory in a murder case is felony murder, a defendant subject to such a verdict is "not 'convicted of a crime . . . which is distinguished into degrees' within the plain and commonsense meaning of section 1157." (*Mendoza, supra,* at p. 908.) Accordingly, section 1157 cannot operate in such a case to reduce the degree of the crime to the lesser degree.

Defendant was prosecuted on the theory that Ruby Reed died while he was engaged in the commission of several felonies. In closing argument, the prosecutor, in arguing defendant was guilty of first degree murder, relied only on a theory of felony murder, and the court instructed the jury on that theory alone. No instruction was given on premeditation or deliberation. Accordingly, as in *Mendoza, supra,* 23 Cal.4th at page 908, defendant was not convicted of a crime " 'distinguished into degrees' "; therefore, section 1157 cannot apply to reduce the degree of the crime.

We reject defendant's two counterarguments. First, he contends *Mendoza's* interpretation of section 1157 violates his constitutional rights because it permits imposition of a harsher sentence based on a fact not found by the jury beyond a reasonable doubt. (*Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348].) But *Apprendi* and its progeny (see *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]) have little to do with this issue. Defendant was sentenced to death, the statutory maximum penalty for first degree murder (§ 190, subd. (a)), based on *the jury's finding beyond a reasonable doubt* that he was guilty of first degree murder with special circumstances. Defendant's *Apprendi* argument presupposes that resubmitting the issue of degree to the jury, which occurred in this case, was somehow improper. Because it was not, *Apprendi's* jury requirement was satisfied, and thus *Apprendi* does not undermine *Mendoza* in any way.

---

[10] *People v. Hendricks* (1987) 43 Cal.3d 584 [238 Cal.Rptr. 66, 737 P.2d 1350], cited by defendant, is distinguishable. In *Hendricks*, the trial court called back jurors it had discharged five months earlier in order to conduct a new sanity phase of the trial. (*Id.* at p. 589.) By contrast, the trial court in the instant case had not yet discharged the jurors, had retained control over them, and had pointedly admonished them to avoid improper influences and not to discuss the case.

Second, defendant contends the retroactive application of *Mendoza* to his case violates due process of law under the Fourteenth Amendment to the United States Constitution. We addressed this issue in *Mendoza* itself, concluding that full retroactivity does not violate due process because "our holding 'neither expands criminal liability nor enhances punishment for conduct previously committed.' " (*Mendoza, supra*, 23 Cal.4th at p. 925.)

### d. *Instruction on the Revised Verdict Form*

Before the jury resumed its deliberations on the question of degree, the trial court charged the jury with this instruction: "The verdict forms originally given you concerning Count 1 should have specified murder in the first degree instead of simply murder. [¶] Revised forms of verdicts as to Count 1 will now be given you specifying murder in the first degree. [¶] Please return to the jury room, deliberate, and render your verdict as to Count 1 using the revised verdict forms."

Defendant contends the instruction was erroneous because it "effectively direct[ed] a verdict for first degree murder" in violation of his Sixth Amendment right to a jury trial, as well as his due process right to a fair trial. We disagree. Although to direct a verdict in a criminal case is constitutionally impermissible no matter how strong the evidence (see *People v. Figueroa* (1986) 41 Cal.3d 714, 725–726 [224 Cal.Rptr. 719, 715 P.2d 680]), the trial court's instruction did not violate this rule. The jury was given two verdict forms when it retired to renew its deliberations. The first form stated defendant was "guilty" of "MURDER IN THE FIRST DEGREE." The jury returned this form, dated and signed by the jury foreperson. The jury was also given a form to find defendant not guilty of first degree murder. The jury returned this form unsigned. Contrary to defendant's argument, the court's instruction did not direct the jury to return a guilty verdict or to find the murder was in the first degree. Instead, the jury was instructed to "deliberate, and render your verdict as to Count 1 using the revised verdict forms." The word "forms" is plural, suggesting the jury should choose between the two verdict forms, one for guilty, one for not guilty. Accordingly, we reject the argument that the trial court's instruction was the equivalent of a directed verdict. To the extent defendant also argues his trial attorney was ineffective for failing to object to the instruction, we reject that argument as well, both because the instruction was unobjectionable and because counsel objected to the entire procedure of having the jury resume deliberations, an objection we take to include reinstructing the jury.

In sum, we find no error in submitting to the jury the question of the degree of the murder two days after it initially returned its guilt phase verdict. We similarly find the trial court's instruction to the jury when submitting the question of degree was not erroneous.

### 2. *Admission of Defendant's Crimes Against J.S. and S.B.*

The prosecutor moved before trial to introduce testimony from J.S. and her granddaughter, S.B., concerning the crimes defendant committed against them in 1983 when he broke into their apartment late at night, tied up J.S., beat and kicked her, and sexually molested S.B. The trial court ruled the evidence was admissible on the issues of identity and intent. Defendant now contends the admission of evidence of his unadjudicated 1983 crimes (see *ante*, at p. 183, fn. 1) violated Evidence Code section 1101, subdivision (b). We disagree.

The rules governing the admissibility of evidence of other crimes are familiar and well settled. Evidence Code section 1101, subdivision (b) provides in pertinent part that evidence of other crimes is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." " 'Evidence of the defendant's commission of a crime other than one for which the defendant is then being tried is not admissible to show bad character or predisposition to criminality but it may be admitted to prove some material fact at issue, such as motive or identity. (Evid. Code, § 1101.) Because evidence of other crimes may be highly inflammatory, its admissibility should be scrutinized with great care. [Citation.]' [Citation.] In cases in which the prosecution seeks to prove the defendant's identity as the perpetrator of the charged offense by evidence he had committed uncharged offenses, admissibility 'depends upon proof that the charged and uncharged offenses share distinctive common marks sufficient to raise an inference of identity.' " (*People v. Medina* (1995) 11 Cal.4th 694, 748 [47 Cal.Rptr.2d 165, 906 P.2d 2].) "A somewhat lesser degree of similarity is required to show a common plan or scheme and still less similarity is required to show intent. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402–403 [27 Cal.Rptr.2d 646, 867 P.2d 757].) On appeal, we review a trial court's ruling under Evidence Code section 1101 for abuse of discretion. (*People v. Lewis* (2001) 25 Cal.4th 610, 637 [106 Cal.Rptr.2d 629, 22 P.3d 392].)" (*People v. Roldan, supra,* 35 Cal.4th at p. 705.)

"As Evidence Code section 1101, subdivision (b) recognizes, that a defendant previously committed a similar crime can be circumstantial evidence tending to prove his identity [and] intent . . . in the present crime. Like other circumstantial evidence, admissibility depends on the materiality of the fact sought to be proved, the tendency of the prior crime to prove the material fact, and the existence *vel non* of some other rule requiring exclusion. [Citation.] Defendant placed all issues in dispute by pleading not guilty." (*People v. Roldan, supra,* 35 Cal.4th at pp. 705–706.) Accordingly, the identity of the person who robbed, raped, sodomized, and killed Ruby Reed, and that person's intent when committing those crimes, were material facts.

■ Defendant's guilt of the crimes against J.S. and S.B. tends to prove these material facts. "For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' " (*People v. Ewoldt, supra,* 7 Cal.4th at p. 403.) "The highly unusual and distinctive nature of both the charged and uncharged offenses virtually eliminates the possibility that anyone other than the defendant committed the charged offense." (*People v. Balcom* (1994) 7 Cal.4th 414, 425 [27 Cal.Rptr.2d 666, 867 P.2d 777].)

As the prosecutor argued in his written points and authorities in support of his motion, defendant's 1983 crimes against J.S. and S.B. were eerily similar to the present crimes against Ruby Reed. In both crimes (1) the victim was attacked in her home, (2) the crime occurred in the late evening or early morning, (3) the victims included older women, (4) the assailant tied the victim's hands behind her back, (5) the assailant tied the victim's ankles together, (6) the assailant wrapped a towel around the victim's head, (7) the assailant pulled up the victim's nightgown, (8) the assailant beat the victim severely, (9) the assailant engaged in criminal sexual conduct, (10) the assailant left candy wrappers at the crime scene, (11) the assailant left personal property at the crime scene, (12) the assailant ransacked the bedroom, (13) the assailant took money, and (14) the assailant "made himself at home."

The prosecutor expanded on these similarities in oral argument at the hearing on the motion. In both the 1983 crimes (against J.S. and S.B.) and the 1987 crimes (against Ruby Reed), the assailant smoked cigarettes and left ashes at the crime scene. On both occasions, the assailant also left candy wrappers around the premises. In the 1983 crimes, the victim heard her assailant using her telephone; in the 1987 crimes, cigarette ashes left by the telephone suggested the perpetrator had used the telephone. In the 1983 crimes, the assailant watched television while the victim lay on the floor, bound and helpless; in the 1987 crime, candy wrappers and ashes found near the chair in which one would sit to watch television suggested the perpetrator had watched television. In both crimes, shoe boxes were removed from a bedroom closet, opened, and then thrown on the floor. In 1983, the assailant pulled victim J.S. by her mouth; in 1987, the victim's false teeth were found near her body. We might add that in both crimes the assailant bound the victim with materials procured at the scene; in neither did he bring rope with him. In light of the distinctiveness and similarity of the characteristics the two sets of crimes shared, the trial court did not abuse its discretion in ruling the jury could legitimately infer from evidence of the 1983 crimes that the same person had committed the 1987 crimes.

On the issue of intent, defendant argues J.S.'s testimony was inadmissible because defendant's 1983 crimes did not involve a homicide and thus were not probative on whether he harbored the intent to kill when he attacked Reed four years later. This contention has two answers. First, J.S. testified that when she first realized defendant was in her room, defendant told her not to make any noise or he would kill S.B. Similarly, S.B. testified defendant coerced her to orally copulate him by threatening to harm her grandmother. This proclaimed readiness to kill during a burglary was probative of defendant's intent in 1987 when he committed a similar break-in. Indeed, the prosecutor made this precise point in closing argument. Second, that no murder occurred during the 1983 crimes may have been because J.S. attempted to escape and defendant lost control of the victims, convincing him to flee and avoid capture. That J.S. and S.B. survived their ordeal does not strongly distinguish defendant's 1983 crimes from those committed in 1987 against Reed that resulted in her death. We therefore reject defendant's assertion that the evidence of the 1983 crimes gave the jury no basis from which to infer what he might have intended when he committed a similar crime in 1987.

To the extent defendant contends his crimes against J.S. should not have been admitted because they were not probative of his intent to rape and sodomize Reed, we reject this claim as well, because, assuming error, it was harmless under any standard. Even should the trial court have excluded the evidence on the issue of intent to commit rape and sodomy, its admission could not have been prejudicial because the evidence was already properly admitted on the issues of identity and intent to kill. Moreover, defendant's intent to commit rape and sodomy was shown by ample circumstantial evidence. We reach the same conclusion with respect to the issue of intent to commit robbery and burglary.

Defendant argues that S.B.'s testimony "was completely irrelevant to either identity or intent for any charged crime" because her grandmother had already testified and reported the basic details of the crime, and that S.B.'s testimony "added only the highly inflammatory detail that [defendant] asked a young girl to orally copulate him." This complaint does not so much challenge the ruling under Evidence Code section 1101, as assert that the evidence was subject to exclusion under Evidence Code section 352 because it was cumulative and more prejudicial than probative. The court denied defendant's section 352 motion to exclude S.B.'s testimony, and we find no abuse of discretion. (*People v. Cox* (2003) 30 Cal.4th 916, 955 [135 Cal.Rptr.2d 272, 70 P.3d 277] [applying abuse of discretion standard].) S.B. confirmed her grandmother's account of the crime in important respects, including how the attack turned sexual once the victims were at defendant's mercy, defendant's willingness to hurt her grandmother, and that defendant

left personal items in the apartment. Moreover, S.B.'s testimony was brief, taking up just four pages of transcript.

### 3. *Alleged Ineffective Assistance of Counsel: Defense Expert Consultants*

Defendant next contends his trial attorney was constitutionally ineffective because he failed to object to testimony and argument suggesting his defense experts' forensic testing had confirmed the prosecution experts' findings and to the prosecutor's reliance on that same evidence in closing argument. The testimony and argument were inadmissible and subject to an objection, he claims, because they constituted improper comment on the exercise of a recognized privilege in violation of Evidence Code section 913. In addition, he claims such comment was inadmissible as violative of his state and federal constitutional rights to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution (and state corollaries) by interfering with his attorney-client relationship and as violative of his federal constitutional right to due process under the Fifth and Fourteenth Amendments because it tended to interfere with his ability to prepare and present a defense. We conclude counsel was not ineffective because he in fact objected to the complained-of testimony on attorney-client privilege grounds, and his failure to object on other grounds was, if deficient, harmless because it is not reasonably probable defendant would have enjoyed a different result had counsel objected.

### a. *Facts*

When the prosecution's forensic expert witnesses on fingerprint identification, hair analysis, and serology testified, the prosecutor asked each of them, largely without objection, whether the evidence they tested was made available to defense experts. In each instance, the answer was affirmative. For example, Deputy Sheriff McRoberts testified he processed the Frontier Hotel receipt for fingerprints. The prosecutor asked him: "Have you shown any of the evidence to an individual that's been retained by [defendant] in this case?" The prosecutor also asked him: "And you provided all of those fingerprints to the individual that has been retained by [defendant]?" McRoberts answered in the affirmative to both questions.

During the testimony of the prosecution's serologist, Elizabeth Kornblum, the following colloquy occurred:

"Q. [THE PROSECUTOR:] You did indicate that certain of the items [tested], you keep them in a permanent state; is that correct?

"A. [THE WITNESS:] That's correct.

"Q. And they're still available to be examined by anybody that the defense would want to have look at them; is that correct?"

"A. Yes, it is.

"Q. And then that individual or individuals, after they actually examine those particular exhibits could come in and either say you are crazy or you're right or you're wrong or whatever they wanted to say?

"A. That's correct.

"Q. Now, in this particular case, these exhibits were released to a defense lab; is that correct?

"A. Yes."

At this point, defense counsel objected on the grounds of relevancy and attorney-client privilege. The trial court immediately overruled the relevancy objection. After the prosecutor explained that he was not seeking to elicit any evidence as to the results defense testing might have obtained, the trial court also denied the objection based on privilege.

In closing argument, the prosecutor argued the evidence defendant's fingerprint was left at the crime scene on the hotel receipt was "uncontradicted" and that, regarding the hair and blood evidence, both prosecution expert witnesses (Burke and Kornblum) "testified that the defense actually tested these things for themselves. [¶] You didn't hear defense experts coming in here and saying Burke was wrong or that Kornblum was wrong or that Hannah Woods was wrong when she made this fingerprint [identification]." Later, concerning Kornblum, the prosecutor said: "[T]he defense can attack her all they want—but she said all items were made available to a defense lab, and if the defense went through the trouble of putting on Dr. Ryan [a defense expert,] you know very well that if the results the defense had from their lab were in one iota different or unreliable, if there was a different result than what Liz Kornblum got, we would have heard what the defense lab did in this case. You know it and I know it. We didn't hear from them. [¶] One rational conclusion. They got the same results as Liz Kornblum." Defense counsel did not object.

### b. *Discussion*

The standard for showing ineffective assistance of counsel is well settled. "In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of

reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [233 Cal.Rptr. 404, 729 P.2d 839].) A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. (*Strickland v. Washington, supra,* at p. 687; *In re Andrews* (2002) 28 Cal.4th 1234, 1253 [124 Cal.Rptr.2d 473, 52 P.3d 656].) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211 [135 Cal.Rptr.2d 553, 70 P.3d 981].) "Failure to object rarely constitutes constitutionally ineffective legal representation." (*People v. Boyette, supra,* 29 Cal.4th at p. 424.)

Defendant relies on four theories for his claim that his defense counsel should have objected to testimony and argument that suggested defense experts had confirmed the findings of the prosecution experts. First, he claims the evidence was inadmissible (and the argument improper) because it constituted comment on the invocation of his attorney-client privilege in violation of Evidence Code section 913, subdivision (a). That statute provides: "If in the instant proceeding or on a prior occasion a privilege is or was exercised not to testify with respect to any matter, or to refuse to disclose or to prevent another from disclosing any matter, neither the presiding officer nor counsel may comment thereon, no presumption shall arise because of the exercise of the privilege, and the trier of fact may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding."

Counsel was not ineffective on this theory because he essentially objected on this ground. As noted, when the prosecutor asked serologist Kornblum whether she had made blood and semen samples available for testing by defense experts and whether such samples were in fact "released to a defense lab," defense counsel objected on the ground of attorney-client privilege. Although counsel did not cite Evidence Code section 913, we deem the objection sufficient to raise the issue. Having had his objection overruled during Kornblum's testimony, defense counsel reasonably may have decided

to forgo making a similar objection during the prosecutor's closing argument, believing such an objection would have been futile.

Second, defendant contends the admission of Kornblum's testimony and the prosecutor's argument violated Evidence Code section 913 in that it constituted comment on his invocation of the work product privilege. Although defense counsel failed to object on this ground, he was not ineffective for failing to do so because such evidence and argument did not constitute "comment" on the "exercise of a privilege." The comments to section 913 by the Assembly Committee on the Judiciary explain that the statute "deals only with comment upon, and the drawing of adverse inferences from, *the exercise of a privilege. Section 913* does not purport to deal with the inferences that may be drawn from, or the comment that may be made upon, the evidence in the case." (Assem. Com. on Judiciary com., 29B pt. 3 West's Ann. Evid. Code (1995 ed.) foll. § 913, p. 168, italics added.) Information that forensic evidence was made available to the defense does not constitute comment on the "exercise of" the work product privilege.

Evidence Code section 913 aside, however, defendant contends counsel was ineffective for failing to object to the prosecutor's argument on the ground that such argument violated the work product privilege. (*People v. Coddington* (2000) 23 Cal.4th 529, 605–606 [97 Cal.Rptr.2d 528, 2 P.3d 1081], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].) Even assuming for argument counsel should have objected on this ground, counsel's failure to object did not result in prejudice. The prosecution's expert witnesses all testified that a scientific analysis of blood, semen, fingerprints, footprints, and hair found at the crime scene implicated defendant as the perpetrator of the crimes. Defendant presented no evidence to dispute these conclusions, and the jury had no reason to question them. In the absence of prejudice, counsel could not have been constitutionally ineffective, even if he should have objected on the ground of work product privilege. (*In re Cox* (2003) 30 Cal.4th 974, 1019–1020 [135 Cal.Rptr.2d 315, 70 P.3d 313] [no need to address issue of deficient performance if no prejudice resulted].)

Defendant contends his trial attorney should have objected on yet two additional grounds. Defendant contends Kornblum's testimony that forensic information was made available to defense experts and prosecutorial argument that the jury should infer that such experts would have confirmed the prosecution witnesses' conclusions violated (1) defendant's federal and state constitutional right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and corollary state provisions by interfering with his attorney-client relationship, and (2) his

federal constitutional right to due process under the Fifth and Fourteenth Amendments because it interfered with his ability to prepare and present a defense.

The record does not indicate why counsel failed to object on these grounds; perhaps counsel chose not to contest the forensic evidence vigorously so as to focus on the testimony of the defense expert, Dr. John Ryan, whose examination of the evidence led him to conclude that the murder victim died of asphyxiation because the gag pushed her tongue back so as to occlude her windpipe. If the jury were to believe this version of events, defense counsel could argue (as he did) that defendant did not intend to kill the victim, thereby sparing him the death penalty. But even were we to assume a reasonably diligent advocate would have objected on these two grounds, defendant fails to persuade us that counsel's omission resulted in prejudice. (*In re Cox, supra*, 30 Cal.4th at pp. 1019–1020.) Absent the now challenged inference the prosecutor raised in closing argument, the jury was still apprised that prosecution experts believed that an analysis of the semen, blood, hair, fingerprints, and shoeprints all inculpated defendant, that no defense evidence contradicted this forensic evidence, that a hotel receipt found at the crime scene bore defendant's fingerprint, that defendant behaved suspiciously at the hotel, and that he made inculpatory statements to Aaron Cansadillas. There being no prejudice, defense counsel's failure to object on the identified grounds was not constitutionally ineffective.

### 4. *Alleged Ineffective Assistance of Counsel: Other Claims*

We have discussed and rejected defendant's claim that his trial attorney was ineffective for failing to prevent the prosecutor from eliciting testimony and presenting argument concerning defendant's expert consultants. (See discussion, *ante*, at pp. 205–209.) Leaving no stone unturned, defendant also contends his trial counsel failed in numerous instances large and small to "exercise the degree of skill ordinarily exercised by reasonably competent defense counsel in a capital trial" and that the cumulative effect of these multiple transgressions and omissions resulted in the ineffective assistance of counsel in violation of his constitutional rights. We reiterate that "[f]ailure to object rarely constitutes constitutionally ineffective legal representation." (*People v. Boyette, supra*, 29 Cal.4th at p. 424.) We address these claims seriatim.

#### a. *Failure to Object or Limit Alleged Errors*

As explained *ante*, at pages 202–205, the trial court did not err in admitting J.S.'s and S.B.'s testimony concerning defendant's crimes against them in 1983. Concerning their testimony, defendant contends counsel was

ineffective for: (1) failing to distinguish, in his moving papers, "between the differing legal standards applicable to prior crimes evidence when used for identity and intent"; (2) failing to argue S.B.'s testimony was "completely irrelevant"; (3) failing to argue the testimony of J.S. and S.B., even if admissible, was not relevant to whether he harbored the intent to kill; and (4) failing to propose a modified version of CALJIC No. 2.50 that could have limited the damaging effect of these witnesses by clarifying to which of the charged crimes the jury could apply the other crimes evidence, and explaining the differing rationales for the admission of the evidence. We disagree.

(1) Regarding the different legal standards for admitting other crimes evidence for identity and intent, counsel addressed this issue in his oral presentation to the court, as defendant admits. We perceive no prejudice from counsel's failure to make this point in his moving papers; certainly the trial court did not appear to misunderstand this point, ruling separately as to identity and intent. (2) As to S.B.'s testimony, we find it quite relevant, corroborating her grandmother's testimony generally and cementing defendant's intent to commit sexual offenses once the victims were incapacitated. (3) The testimony of both J.S. and S.B. was also relevant to proving intent to kill, as defendant threatened to harm both victims if they did not cooperate. His proclaimed readiness to use violence against these two victims was thus relevant to whether he also would use violence against Reed. (4) Because we find the testimony of J.S. and S.B. was properly admitted, the trial court would have had no basis for modifying CALJIC No. 2.50.

### b. *Failure to Seek an Instruction on His Prior Prison Term*

Defendant next argues counsel was ineffective for failing to seek an instruction to inform the jury that he had spent four years in prison for his crimes against J.S. and S.B. Such an instruction, he claims, would have "obviate[d] the danger the jury would punish [him] for crimes for which he had already been punished." The record is silent as to why counsel failed to seek such an instruction. Counsel may have been concerned the jury could have believed defendant spent too little time in prison for his crimes or that he committed the current crime shortly after being released from prison. Because this is not a case where there could be no plausible reason for counsel's omission, we decline to second-guess his decision. This claim is more appropriately presented in a petition for a writ of habeas corpus. (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266–267.)

### c. *Failure to Object to Prosecutorial Error*

Defendant contends that, for a number of reasons, his trial counsel was ineffective for failing to object "or otherwise cure the misconduct of the

prosecutor." These contentions repeat claims raised and addressed elsewhere. (See *post*, at pp. 214–221.)

### d. *Failure to Request Jury Instructions*

Defendant contends that, at several points, his trial counsel was ineffective for failing to request "appropriate jury instructions." These claims repeat ones raised and addressed elsewhere. (See *post*, at pp. 220–221, 233; *ante*, at p. 201.)

### e. *Failure to Request Voir Dire Prior to Penalty Phase*

Defendant next contends trial counsel was ineffective for failing to ask the court to question the jury following the protracted delay between the guilt and penalty phases of the trial, in order to determine whether any of the jurors had been exposed to prejudicial information outside the courtroom. Even assuming for argument that counsel was remiss, defendant does not allege any juror was in fact exposed to such information or that such exposure compromised any juror's impartiality.[11] Indeed, such information is not part of this appellate record. Accordingly, we reject this claim, which is more appropriately raised in a petition for a writ of habeas corpus. (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266–267.)

### f. *Stipulation to Substitution of Jurors*

Between the guilt and penalty phases, counsel either stipulated to, or declined to object to, the substitution of two jurors. Defendant contends counsel was ineffective for acceding to the substitutions. We disagree. Decisions concerning the composition of the jury are tactical (*People v. Lucas* (1995) 12 Cal.4th 415, 480 [48 Cal.Rptr.2d 525, 907 P.2d 373] ["the decision whether to accept a jury as constituted is obviously tactical"]), and nothing in the record suggests counsel's decision to accept the two substitutions falls outside the wide range of acceptable tactical decisions a defense attorney must make. (*People v. Frye* (1998) 18 Cal.4th 894, 979–980 [77 Cal.Rptr.2d 25, 959 P.2d 183].) Indeed, counsel may have been only too happy to have the trial court replace two jurors who had just voted to convict defendant of the first degree murder and forcible rape and sodomy of an elderly woman.

### g. *Failure to Object to Impeachment of Cansadillas*

Aaron Cansadillas told police that, while at Cozette Gray's home, he saw defendant around the time of the crimes and heard him say: "I went in the

---

[11] We note the jurors were extensively admonished by the trial court at the end of the guilt phase not to discuss the case, to avoid media reports of the case, and to inform the court if they were exposed to such information. The jurors were also cautioned that the delay between the guilt and penalty phases "may be a fairly long time."

house and there was somebody—there was a lady in there and I had to shut her up." By the time of trial, Cansadillas had recanted, and he testified he had lied to police. The prosecutor then impeached him with his prior statement, having him first refresh his recollection by reading a transcript of the statement and then reading parts of it into the record, asking Cansadillas each time whether it was an accurate transcription of what he had told the police. Counsel did not object to this line of questioning.

Defendant contends counsel was ineffective for failing to object, "allowing the prosecution repeatedly to reinforce a statement that Cansadillas *admitted* he made, but one which he acknowledged was a fabrication." To the extent defendant is arguing counsel should have objected to revealing the witness's prior inconsistent statement, he is incorrect, for such evidence was properly admitted to impeach the witness. (Evid. Code, § 770.) To the extent defendant is arguing counsel should have objected to the prosecutor's repetition of his questioning technique, no prejudice resulted from this line of questioning. (*In re Cox, supra,* 30 Cal.4th at pp. 1019–1020 [no need to address issue of deficient performance if no prejudice resulted].)

### h. *Failure to Object to Refreshing Margaret Pemberton's Recollection*

During the cross-examination of Margaret Pemberton, Ruby Reed's daughter, a dispute arose over whether, on discovering her mother's body under the blanket, Pemberton had moved the blanket before calling the police. In order to clarify the point, defense counsel read portions of her preliminary hearing testimony aloud and then asked her whether she recalled the exchange. On redirect, the prosecutor did the same. Defendant now contends the witness's prior testimony was not admissible and counsel was thus ineffective for reading it into the record. He also claims counsel was ineffective for not objecting when the prosecutor read parts of the transcript into the record. We reject the ineffectiveness claim, as no conceivable prejudice resulted from this questioning technique. (*In re Cox, supra,* 30 Cal.4th at pp. 1019–1020.)

### i. *Failure to Object when Prosecutor Referred to Crimes as "Burglaries"*

During the examination of several witnesses, both defense counsel and the prosecutor referred to some of the break-ins as "burglaries." Defendant now contends counsel was ineffective for doing so and for not objecting to the prosecutor's use of the term. He analogizes to permitting a lay witness to give improper opinion evidence on the legal definitions of crimes. (*People v. Torres* (1995) 33 Cal.App.4th 37 [39 Cal.Rptr.2d 103].) We find the use, by both sides, of the word "burglary" as a shorthand reference meaning a

break-in or unauthorized entry was innocuous in this context; the jury would not have understood the attorneys to be offering unsolicited testimony on whether the legal elements of a burglary had been proved. We also find that, even if the practice was erroneous, no conceivable prejudice could have flowed from it.

### j. Failure to Object to Characterization of the "Sexual Assault Kit"

During the examination of two prosecution witnesses, both defense counsel and the prosecutor referred to the box of envelopes, vials, swabs, and the like, used to collect forensic evidence, as the "sexual assault kit." Defendant now contends counsel was ineffective for using that phrase and for not objecting to the prosecutor's use of it, claiming the kit merely facilitates the collection of evidence and does not itself prove a sexual assault occurred. He claims the repetition of the phrase "reinforced the inflammatory and biased tone . . . that the prosecution sought to inject into the trial." This claim is empty. In context, we are confident the jury understood the sexual assault kit was merely a group of evidence-gathering tools and that use of the phrase "sexual assault kit" did not itself constitute evidence of a sexual assault. Moreover, even if error, it was manifestly harmless: Evidence showed Reed, an 87-year-old woman, was beaten and strangled and that she had defendant's semen in her vagina and rectum and on her underwear. There is no reasonable probability that, had the attorneys not used the phrase "sexual assault kit," the jury would have reached a different result.

### k. Failure to Object to Pemberton's Testimony

Margaret Pemberton, Reed's daughter, testified that her mother would not have left her home in the state of disarray in which police found it. Specifically, Pemberton testified her mother would not have left candy wrappers on the floor, unwrapped candy about the home, cigarette ashes on the counter, or jewelry and shoe boxes open on the floor. Defendant contends counsel was ineffective for failing to object to this testimony as improper lay opinion evidence. The evidence showed that Pemberton, who had lived across the street from her mother for 14 years, was close to the victim and thus qualified to testify as to her mother's habit and custom of keeping a tidy home. (Evid. Code, § 1105.) In any event, counsel no doubt acted reasonably in refraining from objecting so as not to appear unnecessarily harsh with a sympathetic witness, especially on a topic that was not much in dispute.

### l. Failure to Object to Questions About Prior Testimony

During the redirect testimony of serologist Kornblum, the prosecutor asked her whether she had testified at the preliminary hearing and at the hearing on

defendant's pretrial motion to suppress, and whether defense counsel had asked her the same questions in those hearings. She replied in the affirmative. Later in the trial, the prosecutor also asked Deputy David Crisp, a handwriting expert, whether he had testified in a pretrial hearing. He also answered in the affirmative. Defendant contends his counsel was ineffective for failing to object to both lines of questioning, arguing evidence of the witnesses' pretrial testimony was irrelevant and prejudicial because it suggested their trial testimony bore heightened reliability due to its repetition. We disagree. The apparent purpose of these questions was to indicate that defense counsel had had sufficient time to test the conclusions of these experts. In fact, the prosecutor also asked Kornblum whether her evidence was "still available to be examined by anybody the defense would want to have look at [it]." The testimony was thus relevant, and no basis appears for interposing a defense objection.

### m. *Failure to Object to Testimony About Proficiency Tests*

Kornblum testified she had thrice participated in a proficiency test administered by the American Association of Blood Banking and had not missed a single question on any of the tests. Defendant contends counsel was ineffective for failing to interpose a hearsay objection. We disagree; counsel may well have desired to avoid having a representative of the testing agency take the stand and affirm Kornblum's perfect score for the jury.

### n. *Cumulative Effect*

Finally, defendant contends the cumulative effect of counsel's unreasonable omissions and transgressions rendered his trial unfair in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution and also violated his right to effective legal counsel guaranteed by the Sixth Amendment to the United States Constitution. We find that, considering the instances individually, counsel either performed adequately or there was no prejudice. We have no reason to reach a different conclusion when we consider these claims in the aggregate.

### 5. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor was guilty of numerous instances of misconduct. As we explain, we find these claims were not preserved for appeal. Assuming for argument they are properly before this court, we reject them.

### a. *Impeachment of Dr. Ryan*

The prosecution's expert, Dr. Solomon Riley, testified Ruby Reed died from asphyxiation caused by extreme and prolonged pressure to her neck,

probably caused by her attacker pressing his knee, forearm, or elbow on her neck for four to five minutes. By contrast, defendant's expert witness, Dr. John Ryan, testified that, in his opinion, the evidence, including bruising under the victim's tongue, indicated the gag the attacker placed on the victim's mouth probably worked its way into her mouth, pushing back her tongue, which in turn occluded her windpipe, causing asphyxiation. Dr. Riley expressly rejected that possibility. If the jury accepted Dr. Ryan's interpretation of the evidence, defendant may not have intended to kill Reed.

The prosecutor vigorously challenged Dr. Ryan on cross-examination. For example, the prosecutor attempted to impugn Dr. Ryan's experience in the field by having him admit he was not a board-certified pathologist and had not conducted an autopsy of a homicide victim since 1956. In addition, the prosecutor elicited from Dr. Ryan that he was appointed by the court to assist defendant and was paid by the county, i.e., the taxpayers. The prosecutor revisited this theme in closing argument, emphasizing that Dr. Ryan could not say how much he billed the county for his services in the last year and that his remuneration ultimately came from taxpayers.

 Defendant now contends that, with this line of cross-examination and closing argument, the prosecutor crossed over from vigorous yet permissible cross-examination to misconduct. Because defendant did not object to any of the now challenged cross-examination questions or closing argument statements, however, he failed to preserve the issue for appeal. " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673] (*Hill*).) "Because we do not expect the trial court to recognize and correct all possible or arguable misconduct on its own motion [citations], defendant bears the responsibility to seek an admonition if he believes the prosecutor has overstepped the bounds of proper comment, argument, or inquiry." (*People v. Visciotti* (1992) 2 Cal.4th 1, 79 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

 Even had defendant preserved this claim, we would find no misconduct. " 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [40 Cal.Rptr.2d 456, 892 P.2d 1199]; *People v. Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204].) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial

misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*Hill, supra,* 17 Cal.4th at p. 819.)

■ Defendant complains the prosecutor "impermissibly appealed to the jury's emotions, misinstructed the jury as to the law, and repeatedly exceeded the permissible bounds of even aggressive cross-examination," thereby depriving him of a fair trial. We disagree, because the prosecutor's challenge to Dr. Ryan's professional qualifications was quite routine. Although for a prosecutor intentionally to elicit inadmissible evidence is misconduct (*People v. Smithey* (1999) 20 Cal.4th 936, 960 [86 Cal.Rptr.2d 243, 978 P.2d 1171]), "a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to . . . his or her qualifications" (Evid. Code, § 721, subd. (a)). In challenging Dr. Ryan's educational and professional qualifications to render a persuasive expert opinion, the prosecutor did no more than Evidence Code section 721 expressly permits.

■ Similarly, the prosecutor acted within the bounds of propriety during closing argument. A prosecutor has wide latitude to challenge a defendant's evidence, and so long as the argument is fair comment on the evidence or a reasonable inference drawn therefrom, it is permissible. (*Hill, supra,* 17 Cal.4th at p. 819.) Although defendant argues that the prosecutor's emphasis on the fact the county paid Dr. Ryan's fee was impermissible, we disagree. Evidence Code section 722, subdivision (b) expressly provides that the "compensation and expenses paid or to be paid to an expert witness by the party calling him is a proper subject of inquiry by any adverse party as relevant to the credibility of the witness and the weight of his testimony." (See *People v. Berryman* (1993) 6 Cal.4th 1048, 1071 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on other grounds in *Hill, supra,* at p. 823, fn. 1.) Defense counsel remained free to argue that the prosecutor, his investigators, and his expert witnesses were also paid from public coffers.

■ Nor did the prosecutor, by mentioning that taxpayers ultimately would pay Dr. Ryan's compensation, improperly appeal to the jurors' self-interest. We recently explained that "[a]n attorney's appeal in closing argument to the jurors' self-interest is improper and thus is misconduct because such arguments tend to undermine the jury's impartiality." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 796 [16 Cal.Rptr.3d 374, 94 P.3d 513].) Nothing in the prosecutor's argument, however, implied that the jurors themselves would be financially responsible for Dr. Ryan's compensation. (*Id.* at p. 797.) In addition, inasmuch as it is common knowledge that the trial judge, the prosecutor, the prosecution expert witnesses, and even appointed defense counsel were all paid from the public coffers, we cannot conclude the

attempt to impeach Dr. Ryan with the information the public paid his fee played improperly on the jurors' emotions.

Finally, to the extent defendant claims the prosecutor "misinstructed the jury as to the law," we note the trial court instructed the jury that "[i]f anything concerning the law said by the attorneys in their arguments or at any time during the trial conflicts with my instruction on the law, you must follow my instructions." Absent any contrary indication, we presume the jury followed this instruction. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 919 [4 Cal.Rptr.2d 765, 824 P.2d 571].)

In sum, we find defendant forfeited this claim of prosecutorial misconduct by failing to object on this ground at trial. Further, even had he preserved the claim by objecting, we find the prosecutor did not act improperly in attempting to impeach Dr. Ryan's qualifications. Accordingly, we also reject the claim that counsel was constitutionally ineffective for failing to object. (See *ante*, at pp. 210–211.)

### b. *Intent to Kill*

Defendant next contends the prosecutor committed misconduct by misleading the jury during closing argument on the meaning of intent to kill.[12] For a prosecutor to misstate the applicable law is misconduct (*People v. Boyette*, *supra*, 29 Cal.4th at p. 435), but, as with his claim the prosecutor improperly attacked Dr. Ryan's qualifications, defendant failed to object, thereby forfeiting the claim. (*Hill*, *supra*, 17 Cal.4th at p. 820.) Even had defendant preserved this claim, we would find no misconduct. The prosecutor emphasized that defendant, after binding and gagging the victim, saw she was in severe distress but did not come to her aid and simply watched her die. These actions, the prosecutor argued to the jury, constituted intent to kill.

Defendant strenuously argues the prosecutor incorrectly equated intent to kill with implied malice. By contrast, respondent characterizes the prosecutor's argument differently, contending the prosecutor "argued that [defendant] intended to kill Ms. Reed and that, even if all he did was stuff gags in her mouth and cover her with blankets, he did so with the specific intent to kill her, not just with the intent to increase the probability that she might die or

---

[12] When defendant killed Reed on April 24, 1987, proof of intent to kill was a prerequisite to sustain a felony-murder special-circumstance allegation. (*Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].) *Carlos* was later overruled on this point by *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], decided on October 13, 1987. Crimes committed during the window period between *Carlos* and *Anderson* are controlled by *Carlos*. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1150 [64 Cal.Rptr.2d 892, 938 P.2d 950]; see *In re Baert* (1988) 205 Cal.App.3d 514 [252 Cal.Rptr. 418].)

with disregard to her condition." Thus, by his actions, defendant "was evidencing his original intent to kill her and not to leave until he was sure she was dead, not just walking away and manifesting a disregard for her plight."

We agree with respondent that the prosecutor never argued defendant could be found to have acted with the intent to kill merely by his failure to intervene coupled with his subjective indifference to the consequences of binding and gagging an elderly woman. Rather, the prosecutor argued the victim's death was not incidental or accidental but the predictable outcome of defendant's course of conduct. Because it was likely the victim would suffocate, argued the prosecutor, the jury should infer that when defendant bound, gagged, beat, raped, and sodomized her, he acted with the intent that she should die. Because we find no prosecutorial misconduct, we also reject the claim that counsel was constitutionally ineffective for failing to object. (See *ante*, at pp. 210–211.)

### c. *Other Claims of Misconduct*

Defendant next contends the prosecutor committed misconduct in a number of other ways. Most incidents simply involve the prosecutor's aggressive cross-examination, highlighting weaknesses in the defense case or attempting to diminish Dr. Ryan's professional qualifications. In one incident, while cross-examining Dr. Ryan, the prosecutor used a piece of paper wrapped around his own tie to simulate the gag defendant used on the victim. Even before defense counsel objected, however, the trial court indicated the prosecutor's questioning was argumentative. Although the prosecutor argued vehemently at sidebar that his questioning was permissible, the trial court disagreed. We find no misconduct.

Finally, defendant attempts to equate the prosecutor's actions in this case to those in *Hill*, *supra*, 17 Cal.4th 800, arguing that "the prosecutor engaged in precisely the kind of deceptive and reprehensible conduct that this Court has previously condemned." We disagree; although the prosecutor here was aggressive and at times approached the border dividing zealous yet permissible advocacy from unprofessional conduct, this case is far different from *Hill*, where the prosecutor repeatedly misstated the law and the evidence, referred to facts not in evidence, intimidated a witness, and in general exhibited a sarcastic, rude, unprofessional and offensive personality. We conclude that even if defendant had preserved his claims of misconduct, they would be meritless. Accordingly, we also find no violation of either the state or federal Constitution.

### 6. Alleged Errors Related to the Jury Instructions

#### a. Failure to Instruct on Theft

Defendant contends the trial court erred when it refused[13] to instruct the jury on theft as a lesser included offense to robbery. "It is well settled that the trial court is obligated to instruct on necessarily included offenses—even without a request—when the evidence raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense." (*People v. Ramkeesoon* (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613].) In general, " '[d]ue process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction' " (*People v. Kaurish* (1990) 52 Cal.3d 648, 696 [276 Cal.Rptr. 788, 802 P.2d 278]), and the mere speculation the crime was less than that charged is insufficient to trigger the duty to instruct (*People v. Berryman, supra,* 6 Cal.4th at p. 1081).

Contrary to defendant's assertions, the evidence he committed a robbery was quite strong. Deadly force obviously was applied to the victim, easily satisfying the force or fear requirement for robbery. (§ 211.) And ample evidence showed the intruder had taken the victim's property. The victim's daughter, Margaret Pemberton, testified that her mother accumulated nickels and dimes in jars in her home and all but a single dime of this collection was missing after the murder. In addition, the victim kept a purse with about $20 in it, money that Pemberton periodically would replenish so her mother would have a ready supply of pocket money. After the murder, Pemberton found the purse empty and the home ransacked. Neither side presented any evidence casting doubt on Pemberton's testimony. Defendant, for example, presented a defense of simple denial, and neither he nor the prosecution presented evidence from which the jury could have inferred that he took the victim's property but formed his larcenous intent only after he killed her. (See, e.g., *People v. Ramkeesoon, supra,* 39 Cal.3d at p. 351.) Similarly, neither side presented evidence suggesting he committed the theft but took no part in the killing. In other words, there was no substantial evidence worthy of the jury's consideration that the crime was something less than robbery.

---

[13] This argument misconstrues the record, for the trial court inquired whether defendant was requesting an instruction on theft, but defense counsel failed to request such an instruction. In any event, counsel's acquiescence does not control the analysis for this claim. When evidence substantial enough to merit the jury's consideration is presented to show a crime may be less than that charged, the trial court must instruct on the lesser crime. (*People v. Barton* (1995) 12 Cal.4th 186, 195–196 & fn. 4 [47 Cal.Rptr.2d 569, 906 P.2d 531].) "[N]either the prosecution nor the defense should be allowed, based on their trial strategy, to preclude the jury from considering guilt of a lesser offense included in the crime charged." (*Id.* at p. 196.) Had defense counsel affirmatively requested the instruction be omitted, however, defendant would have forfeited the issue for appeal. (*Id.* at p. 198.)

Accordingly, the trial court did not err in failing to instruct the jury on the lesser included offense of theft, nor was counsel ineffective for failing to request a theft instruction.

### b. *Alleged Threats to Cansadillas*

As noted *ante*, Aaron Cansadillas told police that defendant admitted breaking into a home, finding a "lady" inside, and having to "shut her up." Cansadillas recanted this statement at trial and was impeached with his prior statement. Cansadillas admitted defendant's brothers had been in contact with him about his statement to police and that defendant's mother told him the family did not like "snitches." He denied, however, that any threats had been made. In closing argument, the prosecutor argued "there is only one rational, logical interpretation. And that is that [defendant] made that [incriminating] statement" to Cansadillas, who reported it to the police, but then recanted when it came time to face defendant in the courtroom.

 Defendant contends his defense counsel should have objected to the prosecutor's closing argument and requested an instruction limiting the jury's consideration of evidence that suggested defendant's family had threatened Cansadillas, thereby dissuading him from testifying. " ' "Generally, evidence of the attempt of third persons to suppress testimony is inadmissible against a defendant where the effort did not occur in his presence. [Citation.] However, if the defendant has authorized the attempt of the third person to suppress testimony, evidence of such conduct is admissible against the defendant." ' " (*People v. Hannon* (1977) 19 Cal.3d 588, 599 [138 Cal.Rptr. 885, 564 P.2d 1203]; see *People v. Williams* (1997) 16 Cal.4th 153, 200 [66 Cal.Rptr.2d 123, 940 P.2d 710] [quoting *Hannon* with approval].) Cansadillas never testified that defendant's family actually had threatened him as a result of his statement to police; he merely said he had spoken with defendant's brothers and that defendant's mother had said their family did not like "snitches." Nor did the prosecutor say otherwise in his closing argument. Under the circumstances, counsel's failure to object to the prosecutor's argument on this ground was reasonable.

 In any event, "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his] credibility and is well within the discretion of the trial court." (*People v. Burgener* (2003) 29 Cal.4th 833, 869 [129 Cal.Rptr.2d 747, 62 P.3d 1].)

Defendant also claims counsel was constitutionally ineffective for failing to request an instruction limiting the jury's consideration of Cansadillas's

testimony, but we reject the claim for the same reason: Cansadillas never actually said he had been threatened as a result of his statement to police; hence, no reason existed to limit the jury's consideration of his testimony.

### 7. Denial of Severance

Counts 1 to 5 in the information charged crimes committed against Reed, including burglary, robbery, sexual assault, and murder. Counts 6 to 11 in the information charged defendant with burglaries committed in the homes of Barry, Darling, Hostetler, Patchin, Lozano, and Meldrum, none of whom was personally injured. Before trial, defendant moved unsuccessfully to sever the counts concerning the crimes against Reed from the burglary charges against these other victims. Defendant now claims the trial court prejudicially abused its discretion by denying the motion. We disagree.

██ "An accusatory pleading may charge two or more different offenses connected together in their commission, or two or more different offenses of the same class of crimes. (§ 954.) Offenses falling within this description, but charged in separate pleadings, may be consolidated for trial in order to promote judicial efficiency [citation], and a trial court's rulings on joinder are reviewed for abuse of discretion." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1074 [119 Cal.Rptr.2d 859, 46 P.3d 335].)[14] Defendant concedes the crimes were all of the same class. We note also the crimes were properly joined because they were "connected together in their commission": the break-ins all occurred around the same time, in the same way, and in the same general area, within "some miles" of each other. Accordingly, defendant "can predicate error in denying the [severance] motion only on a clear showing of potential prejudice." (*People v. Kraft* (2000) 23 Cal.4th 978, 1030 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

Defendant argues four factors undermine confidence in the trial court's denial of severance, asserting: (1) the burglaries charged in counts 6 to 11 would not have been cross-admissible in a separate trial for the crimes against Reed; (2) certain of the charges were likely to inflame the jury against defendant; (3) the People joined a strong case (counts 1 through 5) to some weak cases (counts 6 to 11) in order to increase the success of all counts; and (4) the joinder of a death-penalty-eligible offense with noncapital crimes was prejudicial.

---

[14] Section 954 provides in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

Where two crimes or, as here, two sets of crimes, are tried jointly and the evidence of one set would not have been admissible in the trial of the other had they been tried separately, the potential for prejudice is increased. This is because the jury in a joint trial will be exposed to additional evidence of the defendant's criminal behavior, raising the possibility the jury will be swayed by the evidence of the defendant's bad character. Where evidence would have been cross-admissible in separate trials, however, " 'any inference of prejudice is dispelled.' " (*People v. Memro* (1995) 11 Cal.4th 786, 850 [47 Cal.Rptr.2d 219, 905 P.2d 1305].)

Here, defendant committed multiple break-ins on the same night. Four of the break-ins occurred in the same trailer park, within 20 minutes of each other. A fifth burglary occurred across the street on the same night, and the sixth a few miles away a few days later. Police found defendant's fingerprint at the point of entry of one of the burglaries. Defendant often chose trailer parks (Reed also lived in a trailer) and entered each trailer in the same way, prying open window screens. All of the break-ins occurred during the night. Defendant took only money, leaving credit cards and jewelry. He left evidence at the crime scenes of having smoked cigarettes during the crime. Faced with these circumstances, the trial court reasonably concluded the crimes bore sufficiently similar characteristics such that the evidence of the noncapital burglaries would have been cross-admissible in a separate capital trial, and vice versa.

Having concluded evidence of the crimes was cross-admissible, we need not address defendant's other contentions concerning the trial court's denial of his severance motion, for he could not have been prejudiced by the court's denial. We conclude the trial court did not abuse its discretion in denying the motion for severance.

## II. PENALTY PHASE

### A. *Facts*

#### 1. *Aggravating Evidence*

Mark Tate testified that on January 6, 1980, he was a deputy sheriff in Riverside County. On that date, he was escorting a group of county jail inmates, including defendant, to a recreation yard. He was unarmed. Suddenly one of the inmates grabbed him from behind in a choke hold and held a shank to his back. While the inmate held Tate, defendant grabbed the keys from Tate's belt and attempted to open a door to the outside. When none of the keys fit the lock, the inmate holding Tate demanded the key, which Tate surrendered to defendant. Tate was led to the outer fence and used as a

human shield. Defendant opened the outer gate with the key and fled with two other inmates. They were captured within two hours.

Kenneth Webb testified that on February 24, 1980, he was a deputy sheriff in Riverside County working in the county jail. On that day, while he escorted defendant from the showers, defendant stepped behind him and threatened to stick him with a sharpened spoon if Webb did not surrender his keys. Webb, unarmed, threw the keys and then confronted defendant, who ran and tried unsuccessfully to kick down a door leading to the outside. Defendant was eventually subdued by a group of deputies.

Mary Handley-Carter testified she was a custodian of records for the Department of Corrections and possessed documents showing defendant, under the name of "Mario Timbers," was convicted of assault with a deadly weapon (§ 245, subd. (b)) on March 31, 1980. On the same day, "Timbers" was also convicted of false imprisonment (§ 236). Andrew Lee, a fingerprint technician, testified he rolled defendant's fingerprints the day of testimony and they matched those of "Mario Timbers."

The parties stipulated to allow the jury to consider the testimony of J.S. and S.B. as aggravating evidence.

### 2. *Mitigating Evidence*

Defendant's sister (Marie Debra Smith), his aunt (Geneva Henderson), and his mother (Aurora Gray) all testified for defendant and provided family background information in mitigation. They all told essentially the same story: Defendant came from a large family and was a loving, caring child who helped people when he was young. Smith married when defendant was young and moved out of the family home, which upset defendant. Around this time, defendant was stabbed when he tried to protect someone.

When defendant was about 13 years old, the family moved to a housing project called Nickerson Gardens, and defendant changed and became quieter. Henderson thought he probably fell in with the wrong crowd. He began sniffing glue, and his personality changed. He did not have a good role model because his father moved out of the house when he was a young child. Both Henderson and Smith testified that they loved defendant very much, though both admitted they did not know the circumstances of defendant's crimes.

Defendant's mother testified that when she began having personal problems, defendant slept in her living room to calm her fears. He also gave her money for food and rent. She admitted he had been incarcerated for most of his life since the age of 16.

### B. *Discussion*

#### 1. *Denial of a Continuance*

Near the end of the extended delay following the guilt phase occasioned by the writ proceedings in the Court of Appeal and this court, the parties gathered in the trial court on November 2, 1989, to set a date for the commencement of the penalty phase. By that time, this court had transferred the writ matter back to the appellate court, which had ruled in the People's favor. (Defendant petitioned for review on November 8, six days after the hearing, and this court denied the petition on January 4, 1990.) Both sides agreed to the trial court's proposal to put the case over to January 29, 1990. The court ordered the parties to return on that day, adding: "That looks like that is a real good day and [the case will] probably go then."

On January 26, defense counsel filed a motion for a continuance with the trial court. When the parties and the jury reassembled in court on January 29, 1990, defense counsel explained that he desired a one-week continuance because he was trailing in a double homicide case and had some problems with some witnesses he expected to call at the penalty phase. The prosecutor responded: "I have witnesses on call today because I subpoenaed them. [Defense counsel] could have done the same thing." The trial court held an in camera hearing, in which defense counsel explained that he expected to call defendant's mother, Aurora Gray, and his sister, Marie Debra Smith. Mrs. Gray had moved during the prior six weeks, and counsel had not yet attempted to contact her. Smith had been out of town the prior week. Counsel had not subpoenaed either witness.

Back in open court, the trial court heard argument from the attorneys. Defense counsel averred that he was not prepared to proceed because he had been preparing for another murder trial. The prosecutor vehemently objected to any delay, arguing that defense counsel long knew of the January 29 date and that he simply was trying to delay the penalty phase, as evidenced by his last minute request for a stay in federal court. The prosecutor also noted that he, too, was simultaneously working on another case, as well as presently participating in a preliminary hearing involving multiple defendants and witnesses from Italy and New York. Understanding from the court's earlier pronouncements that defendant's penalty phase would begin on January 29, however, he had made arrangements to be able to proceed in defendant's case.

The trial court denied the continuance. The prosecutor then announced that after presentation of the People's case, he would not oppose a short continuance should defense counsel need one to secure the presence of his witnesses.

██ Defendant now contends the trial court abused its discretion by denying his motion for a continuance. "The determination of whether a continuance should be granted rests within the sound discretion of the trial court, although that discretion may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare." (*People v. Sakarias* (2000) 22 Cal.4th 596, 646 [94 Cal.Rptr.2d 17, 995 P.2d 152].) Applying this standard, we find no abuse of discretion. Defense counsel had many months to prepare for the penalty phase and was specifically on notice as of the November 2, 1989, hearing that the penalty phase would most probably begin on January 29, 1990. Counsel made no complaint of this schedule until shortly before the January 29 hearing, and his failure to subpoena family members, coupled with the fact that both defendant's sister and mother testified on January 30, speaks loudly in favor of the trial court's exercise of discretion. We reject defendant's reliance on *People v. Fontana* (1982) 139 Cal.App.3d 326, 333 [188 Cal.Rptr. 612], a case in which an appellate court found a trial court abused its discretion when it denied a continuance despite defense counsel's assertion that he was not prepared to proceed. Although counsel here also claimed he was unprepared to proceed, the trial court reasonably concluded that, given the many months counsel had to prepare and the number and nature of his anticipated witnesses, counsel's assessment of the state of his readiness was exaggerated and a continuance was not necessary.

Having found the trial court did not abuse its discretion, we also find defendant fails to demonstrate that the denial of a continuance rendered his attorney's assistance constitutionally ineffective. As in *People v. Sakarias*, "[t]he record demonstrates neither that counsel performed below the standard of a reasonably competent attorney in arguing the . . . motions, nor that the single additional step defendant asserts should have been taken was reasonably likely to affect the result." (*People v. Sakarias, supra,* 22 Cal.4th at p. 647.) We likewise reject defendant's claim that the denial of a continuance violated his federal constitutional rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### 2. *Delay Between Guilt and Penalty Phases*

The jury returned its verdict of first degree murder on February 24, 1989. The jury was then warned that the commencement of the penalty phase might be delayed. The trial court admonished the jurors not to discuss the case with anyone, not to speculate on the reason for the delay, to avoid media accounts, and to inform the court if any of them were exposed to such accounts. The court also indicated that if the delay was lengthy, one of the alternates might end up on the jury. While the Court of Appeal and this court were considering defendant's writ application in the months following the guilty verdict, the

jury returned to court several more times, each time being told of further delays and being readmonished. The writ proceedings finally concluded, and the penalty phase commenced on the afternoon of January 29, 1990, 338 days after the end of the guilt phase.

Defendant contends this 338-day hiatus between the guilt and penalty phases of his trial violated his constitutional rights and requires reversal of the penalty judgment. We disagree. At the threshold, we note defendant did not object to the delay, which was, in fact, instigated at his behest inasmuch as he filed a petition for a writ of mandate or prohibition with the Court of Appeal, and that court first issued a stay and then ruled initially in his favor. When asked on April 17, 1989, whether the court should put the case over until September, defense counsel replied: "I think that is a good idea." Counsel's failure to object in any way, and indeed his responsibility for instigating the delay, preclude raising the issue on appeal. (See *People v. Johnson* (1993) 19 Cal.App.4th 778, 791–794 [23 Cal.Rptr.2d 703] [failure to object to break in jury deliberations forfeits claim for appeal]; *People v. Harris* (1977) 73 Cal.App.3d 76, 83 [140 Cal.Rptr. 697] [same].)

But even were we to assume that defendant had properly preserved the issue for review, we would reject it on the merits. In arguing the delay requires reversal, defendant relies heavily on *United States v. Hay* (9th Cir. 1997) 122 F.3d 1233 (*Hay*) and *People v. Santamaria* (1991) 229 Cal.App.3d 269 [280 Cal.Rptr. 43] (*Santamaria*), but both cases are distinguishable. In *Hay*, the defendant was prosecuted for mail fraud. The trial took longer than expected, and some jurors informed the trial judge that the trial might overlap with their planned summer vacations. The trial court accommodated these jurors by continuing the case, at the close of evidence, for 48 days over the summer. Significantly, the defendant moved unsuccessfully for a mistrial, thereby preserving the issue for appeal. (*Hay*, *supra*, at p. 1235.) The Ninth Circuit Court of Appeals reversed the conviction, holding the district court had erred by continuing the trial for such a lengthy period. The federal appellate court explained that, by the time the district court granted the continuance, the trial was nearly over, and the parties had stipulated to proceeding with 11 jurors if necessary. Moreover, the *Hay* court opined: "[W]e have never approved a jury separation even close to forty-eight days in a criminal case" (*id.* at pp. 1235–1236), terming the length of the delay "unprecedented" (*id.* at p. 1236).

We are, of course, not bound by the decisions of lower federal courts (*People v. Avena* (1996) 13 Cal.4th 394, 431 [53 Cal.Rptr.2d 301, 916 P.2d 1000]), but in any event we find *Hay* differs from the instant case in important respects. First and foremost, the defendant in *Hay* preserved the issue by moving for a mistrial because of the delay, whereas defendant here

not only failed to object, but actively sought the delay by filing a writ petition that led to the stay of trial. In *Hay*, moreover, the delay occurred between the presentation of evidence and submission of the case to the jury for deliberations. As the *Hay* court explained: "[T]he jury could not be expected to adjourn this late in the case for a month and a half without forgetting any of the relevant evidence." (*Hay, supra,* 122 F.3d at p. 1236.) The delay in the instant case, by contrast, came between the guilt and penalty phases of the trial; the jury had already returned a guilt verdict but had not yet heard any penalty phase evidence. Although a trial of a capital offense is a unitary one with two parts (*People v. Cain* (1995) 10 Cal.4th 1, 67 [40 Cal.Rptr.2d 481, 892 P.2d 1224]), as defendant emphasizes, we nevertheless find *Hay* distinguishable because it presents a much more egregious situation: the jury in that case had just been presented with the evidence on which it would deliberate when the district court abruptly continued the case for more than a month, whereas in defendant's case the jury's penalty decision would turn largely on evidence the jury had not yet heard or for which the jury had already rendered a verdict.

Although the presentation of penalty phase evidence had not yet begun, defendant argues the jury, when determining the appropriate penalty, could properly consider evidence from the guilt phase. Thus, the jury was properly instructed to consider both the circumstances of the offense (§ 190.3, factor (a)) and the evidence presented in the "entire trial." If the jury in *Hay, supra,* 122 F.3d 1233, could not be expected to recall evidence given 48 days previously, defendant argues, the jury here could not be expected to recall evidence presented even further in the past, some of which was over one year old.

We acknowledge the possibility the long delay in this case may have caused jurors to forget details of the evidence produced at the guilt phase. But that result is an inevitable consequence of *defendant's* midtrial pursuit of appellate relief. He cannot have it both ways. He sought appellate court intervention midway through his trial, as was his legal right. Surely the delay inherent in pursuing that course cannot now become the basis for reversing the judgment. In any event, any concern we have that the jury may have forgotten evidence presented in the guilt phase is ameliorated by (1) the fact the jury had already deliberated on the question of guilt and rendered a verdict, necessarily having reviewed the evidence in detail at that time, and (2) the trial court's offer to read back any testimony the jury wished to hear.

Defendant also relies on *Santamaria, supra,* 229 Cal.App.3d 269, but we find that case unpersuasive. In one sense, *Santamaria* presents an even more egregious case than in *Hay*, for the trial court in *Santamaria* continued the case for 11 days *in the middle of jury deliberations,*apparently to accommo-

date the trial judge's schedule. (*Santamaria, supra*, at pp. 274–275.) To be sure, the *Santamaria* court emphasized the risk such delay could engender, from faded memories to juror contamination from outside sources.[15] But in deciding to reverse the conviction, the *Santamaria* court also stressed the absence of good cause for the delay: "The record in the present case discloses no administrative duties, congested calendar, or any other exceptional circumstances to explain the continuance; instead, the record indicates only that the judge was to be 'away,' and that at least two of the days involved were holidays. If there was any established necessity for the delay, it is not apparent from this record." (*Id.* at p. 277.)

In deciding to reverse, the *Santamaria* court also relied on the availability of alternatives. "Another factor influencing our assessment of the court's action is the existence of an alternative to suspending deliberations. The trial court here might have utilized the procedure set forth in section 1053, which authorizes the substitution of one judge for another under certain circumstances in criminal cases. [Citations.] Although the prosecutor suggested a substituted judge and the record before us indicates that appellant did not object to the suggestion, the record is absolutely silent about the court's reasons for rejecting the section 1053 procedure." (*Santamaria, supra*, 229 Cal.App.3d at p. 278, fn. omitted.)

Although the delay in the instant case was much longer than in *Santamaria*, it occurred at a natural break in the trial, between the guilt and penalty phases, and not in the middle of deliberations. Moreover, unlike in *Santamaria*, where the trial court lacked good cause for the delay and a viable alternative existed, the trial court here had ample cause for the delay and no alternative: an appellate court had stayed the trial. The trial court had no choice but to obey the stay order. Under the circumstances, we find *Santamaria* distinguishable and thus not persuasive here.

Defendant contends the potential for juror exposure to prejudicial information during the long delay was intolerable and requires reversal. Defendant does not conclude any juror *actually* received extrajudicial information, which might constitute misconduct giving rise to a presumption of prejudice.

---

[15] Thus, the court explained: "A long adjournment of deliberations risks prejudice to the defendant both from the possibility that jurors might discuss the case with outsiders at this critical point in the proceedings, and from the possibility that their recollections of the evidence, the arguments, and the court's instructions may become dulled or confused. [Citations.] Obviously, the longer the separation, the greater the risk. A long adjournment of deliberations also disrupts the very process and pattern of the jury's orderly examination of the evidence. The People cite no case in which an interruption of jury deliberations of such length has been countenanced in a criminal case, and our own independent research has not uncovered any similar case." (*Santamaria, supra*, 229 Cal.App.3d at pp. 277–278.)

(See *People v. Nesler* (1997) 16 Cal.4th 561, 578 [66 Cal.Rptr.2d 454, 941 P.2d 87] (lead opn. of George, C. J.).) Instead, he contends that in the "media climate" that existed at the time, "it is reasonable to infer that the jurors in this case were exposed to tremendous improper influences during the extraordinary separation between the guilt phase and the penalty phase." We do not agree that, in the absence of any proof and in the face of the trial court's admonitions to the jury, it is "reasonable to infer" the jury's impartiality was compromised. The possibility of some exposure to improper information is a concern, but the possibility of such jury contamination is unavoidable given that defendant himself exercised his right to seek appellate relief on the issue of the degree of the murder, thereby delaying the start of the penalty phase.

The situation in this case is analogous to the one in *Stanley, supra,* 10 Cal.4th at page 836, where the trial was delayed by more than three months between the guilt and penalty phases while the trial court determined the defendant's competence to stand trial. On appeal, the defendant in *Stanley* argued the length of the delay justified creation of a rule raising a presumption that the jurors were exposed to improper information that undermined the jury impartiality to which he constitutionally was entitled. We declined to create such a rule, explaining: "During the trial, the trial court admonished the jurors each evening to avoid discussing the case, forming or expressing any opinion on it, or reading or listening to anything connected with the case that might appear in the news media. Just before the hiatus, the court gave a particularly strong admonition. . . . In the absence of any contrary showing, we presume the jurors followed the admonition." (*Id.* at pp. 836–837, fn. omitted.)

 As did the court in *Stanley, supra,* 10 Cal.4th 764, the trial court here carefully admonished the jurors not to discuss the case, to avoid improper influences, not to speculate about the reason for the delay; and to inform the court if any such improper contact occurred.[16] Although defendant argues the trial court did not rigorously admonish the jury each time it met, sometimes failing to direct the jury to avoid media coverage, " '[e]rror in

---

[16] For example, on September 18, 1989, the trial court admonished the jury: "I have to give you [an] admonishment. You must decide all questions of fact from the evidence received in this trial and not from any other source. You must not make any independent investigation of the facts or the law or consider or discuss facts as to which there is no evidence.

"This means, for example, you must not on your own visit the scene, conduct experiments or consult reference works for additional information.

"[You] [m]ust not discuss this case with any other person excepting a fellow juror and must not discuss the case with a fellow juror until the case is submitted to you for your decision and only then when all jurors are present in the jury room. [¶] . . . [¶] . . . Now, very unlikely there be anything in the paper, but I never know. If you run across anything and the headlines warn you that there is something about it, don't read it. If there is anything in the radio that comes in on it, turn[] it off or get away from it or the television the same. If that happens and then you let us know what portion you did hear if any."

failing to give the required admonition does not require reversal unless the defendant calls the trial court's attention to the omission at the time of the adjournment, or unless the defendant on appeal affirmatively points to prejudice resulting from the omission.' " (*People v. Heishman* (1988) 45 Cal.3d 147, 175 [246 Cal.Rptr. 673, 753 P.2d 629].) Defendant failed to object or otherwise direct the court's attention to these various omissions and thus failed to preserve this claim. Were we nevertheless to address the merits of the claim, we would reject it. The jury was strongly cautioned, both during the guilt phase and during the delay, to avoid reports of the case in the media, and both sides stipulated that the jury would be deemed properly admonished at every recess. ▇▇▇ To give an abbreviated admonishment after first delivering a full one is permissible. (See *People v. Morales* (1989) 48 Cal.3d 527, 565 [257 Cal.Rptr. 64, 770 P.2d 244] [addressing § 1122]; *People v. Linden* (1959) 52 Cal.2d 1, 29 [338 P.2d 397] [same].) Moreover, the jurors could not reasonably have understood that they were suddenly allowed to read about the case in the newspaper simply because the trial court failed on one occasion to admonish them not to. Under the circumstances, the mere possibility the jury may have acquired or been exposed to some extrajudicial information about the case is an insufficient basis on which to reverse a judgment.

Defendant also contends that, during the long hiatus in the trial, jurors might have changed their views about the death penalty, rendering them ineligible to continue to serve. This possibility exists even in trials with no delay. In any event, defendant's assertion that one or more jurors may have altered their views about capital punishment during the trial delay is pure speculation and will not support a reversal of the judgment. (Cf. *People v. Bradford* (1997) 15 Cal.4th 1229, 1355 [65 Cal.Rptr.2d 145, 939 P.2d 259] [assertion that jurors, "having found defendant guilty, no longer could be impartial" for the penalty phase was mere speculation].)

▇▇▇ Defendant contends reversal is required because, when the trial resumed, the court failed to voir dire the jurors to determine if any of them had been exposed to improper influences. But defendant did not move to voir dire the jury when it reconvened,[17] nor did he present evidence that any juror had been exposed to improper influence or information. "Voir dire is not to be reopened on speculation that good cause to impanel a new jury may thereby be discovered; rather, a showing of good cause is a prerequisite to reopening." (*People v. Fauber* (1992) 2 Cal.4th 792, 846 [9 Cal.Rptr.2d 24, 831 P.2d 249].) No reason appearing to have examined the jurors anew, we conclude the trial court did not abuse its discretion in failing sua sponte to do so.

---

[17] Defense counsel had an opportunity to move for a renewed voir dire of the jury when the parties discussed whether to accept the request of certain jurors to be removed for reasons of hardship that arose during the delay in proceedings.

(*People v. Bradford, supra,* 15 Cal.4th at p. 1353 ["The trial court's decision not to . . . re-voir dire the jury is subject to reversal only upon an abuse of discretion"].)

Defendant also contends that because the trial took much longer than was originally promised, the jurors—finally appearing for the penalty phase after so many weeks—would have been "unfavorably disposed towards [defendant] since it was [he] who caused them to live with this criminal trial for an extended period of time." But the jury was never told the cause of the delay and was explicitly admonished not to speculate on the reason. We presume that jurors understand and follow the court's instructions. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [286 Cal.Rptr. 801, 818 P.2d 84].)

Finally, defendant argues the prejudicial effect of the delay was compounded by the replacement at the penalty phase of two guilt phase jurors with alternate jurors. As noted *ante,* at page 211, defense counsel stipulated to one of the replacements and did not object to the other. The alternates were subjected to the same admonishments as the regular jurors; in fact, the trial court warned the jurors at the outset of the delay that some alternates might be called into service. Defendant claims the absence of the new jurors from the guilt phase deliberations somehow worked to his detriment, but does not explain why this is so. His further complaint that the penalty phase jury was not instructed to begin deliberations anew is baseless: Because the alternates were substituted in before presentation of the penalty phase evidence began, no such instruction was necessary. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1030 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

In summary, we conclude the long delay between the close of the guilt phase and the commencement of the penalty phase does not warrant reversal of the penalty judgment.

### 3. *Failure to Instruct on Lingering Doubt*

Defendant contends the trial court erred by failing to instruct sua sponte that a lingering doubt as to guilt can constitute a mitigating circumstance. He acknowledges that we have held trial courts are under no obligation to so instruct a capital jury, even on request (*People v. Staten* (2000) 24 Cal.4th 434, 464 [101 Cal.Rptr.2d 213, 11 P.3d 968]; *People v. Hines* (1997) 15 Cal.4th 997, 1068 [64 Cal.Rptr.2d 594, 938 P.2d 388]), but insists three aspects of his trial justify a different result. First, he emphasizes that defense counsel specifically relied on lingering doubt in his penalty phase closing argument. Second, he contends the addition of two alternate jurors to the penalty phase jury heightened the need for a lingering doubt

instruction. Third, he argues the long delay between the guilt and penalty phases justifies imposing a duty on the trial court to instruct on lingering doubt.

We adhere to our prior decisions on this subject and find unpersuasive defendant's attempt to characterize his case as distinguishable from past cases. First, that defense counsel relied on a lingering doubt defense in closing argument[18] does not undermine our prior decisions in this area. In *People v. Johnson* (1992) 3 Cal.4th 1183, 1252 [14 Cal.Rptr.2d 702, 842 P.2d 1], the defendant argued his "right to argue his possible innocence is 'but a hollow formality' if instructions supporting the theory of the defense are not given." We disagreed, explaining that such argument by defense counsel is supported by instructions on "the expanded factor (k) instruction." (*Ibid.*) Defendant's jury was so instructed: It was told to consider, if applicable, "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspects of defendant's character or record that the defendant offers as a basis for a sentence less th[a]n death whether or not related to the offense for which he is on trial." This instruction adequately informs the jury that it may consider a lingering doubt as to guilt (*People v. Hines, supra,* 15 Cal.4th at p. 1068); that defense counsel relied on a lingering doubt defense in closing argument did not create a duty in the trial court to give a more specific instruction on lingering doubt as a mitigating factor.

▇▇▇ Second, that two alternate jurors were substituted in for the penalty phase does not alter the analysis. Although a trial court is free to instruct on lingering doubt in such circumstances (see *People v. Cain, supra,* 10 Cal.4th at pp. 64–67),[19] the trial court was under no legal obligation to do so. Significantly, the alternate jurors joined the jury at the commencement of the penalty phase, so no issue of setting aside the deliberations is raised. The penalty phase jury, including the alternates, was properly instructed to consider "[t]he circumstances of the crime of which the defendant was convicted." (§ 190.3, factor (a).) This instruction adequately permitted the jury, including the alternates, to consider lingering doubt as a mitigating factor.

Third, we reject the argument that the long delay between the guilt and penalty phases of the trial somehow created a heightened duty in the trial court to instruct on lingering doubt. Defendant argues that none of the cases cited in support involved such a long delay and that "the jurors . . . inevitably

---

[18] Defendant overstates the case in describing lingering doubt as "one of the primary theories on which [his] penalty phase defense rested."

[19] Defendant misconstrues the holding of *People v. Cain, supra,* 10 Cal.4th 1, which— contrary to defendant's contention—did not "recognize the necessity of such an instruction."

forgot much of the evidence that had been presented in the guilt phase of the trial." Because the jury was instructed to consider "[t]he circumstances of the crime of which the defendant was convicted," we assume the jury did just that. A pinpoint instruction to consider lingering doubt, if such existed in the minds of the jurors, would have added little to the jury's decisionmaking.

Defendant also contends the failure to instruct on lingering doubt violated various of his rights under the United States Constitution. We disagree. (*Franklin v. Lynaugh* (1988) 487 U.S. 164, 173–174 [101 L.Ed.2d 155, 108 S.Ct. 2320]; *People v. Staten, supra*, 24 Cal.4th at p. 464.) In sum, we find the trial court did not err in failing to instruct the jury on lingering doubt as a mitigating factor and further conclude counsel was not ineffective for failing to request such an instruction.

### 4. *Cumulative Impact of Delay and Use of Replacement Jurors*

Defendant repackages previous arguments to contend that the long delay between the guilt and penalty phases, the failure to voir dire the jury following the resumption of the trial, the replacement of two jurors who sat on the guilt phase jury, the mere possibility (despite the absence of any evidence) that one or more jurors were exposed to improper information during the delay, and the trial court's failure to instruct the jury to begin deliberations anew or how otherwise to consider the issue of lingering doubt "combined to create a structural defect in the penalty phase that renders the jury decision unreliable" in violation of defendant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I of the California Constitution. Having found no error in any of the aforementioned aspects of the trial, we reject the assertion that their cumulative effect undermined defendant's constitutional rights. Moreover, the delay here—occasioned as it was by defendant's actions—does not even remotely resemble the type of structural error the high court has held requires reversal of a judgment in the absence of prejudice.[20]

---

[20] Thus, the high court has explained: "A 'structural' error, we explained in *Arizona* v. *Fulminante* [(1991) 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246]], is a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself,' [citation]. We have found structural errors only in a very limited class of cases: See *Gideon* v. *Wainwright,* 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792] (1963) (a total deprivation of the right to counsel); *Tumey* v. *Ohio,* 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437] (1927) (lack of an impartial trial judge); *Vasquez* v. *Hillery,* 474 U.S. 254 [88 L.Ed.2d 598, 106 S.Ct. 617] (1986) (unlawful exclusion of grand jurors of defendant's race); *McKaskle* v. *Wiggins,* 465 U.S. 168 [79 L.Ed.2d 122, 104 S.Ct. 944] (1984) (the right to self-representation at trial); *Waller* v. *Georgia,* 467 U.S. 39 [81 L.Ed.2d 31, 104 S.Ct. 2210] (1984) (the right to a public trial); *Sullivan* v. *Louisiana,* 508 U.S. 275 [124 L.Ed.2d 182, 113 S.Ct. 2078] (1993) (erroneous reasonable-doubt instruction to jury)." (*Johnson v. United States* (1997) 520 U.S. 461, 468–469 [137 L.Ed.2d 718, 117 S.Ct. 1544].)

### 5. *Factor (b): Implied Use of Force*

At the prosecution's request, the trial court gave CALJIC No. 8.87 (1989 rev.) to direct the jury's consideration of evidence of defendant's unadjudicated[21] criminal conduct. Thus, the jury was instructed:

"Evidence has been introduced for the purpose of showing that the defendant Mario Lewis Gray has committed the following criminal acts:

"One, the unlawful oral copulation by force or threat upon [S.B.]

"Two, the assault with intent to commit rape upon [J.S.]

"Three, the assault with intent to commit oral copulation upon [J.S.]

"Four, the assault by force likely to produce great bodily injury upon [J.S.]

"And, five, the robbery of [J.S.] *which involve the express or implied use of force or violence or the threat of force and violence.*[22]

"Before a jury may consider any such criminal act as an aggravating circumstance in this case a juror must be first satisfied beyond a reasonable doubt that the defendant Mario Lewis Gray did, in fact, commit such criminal act." (Italics added.) This instruction is a standard jury instruction and is unchanged to this day. (See CALJIC No. 8.87 (July 2004 ed.).)

Defendant argues this instruction (hereafter the factor (b) instruction) improperly directed a verdict as to an "essential element" that required a jury decision, to wit, whether or not his prior criminal conduct involved the express or implied use of force or violence. He contends the jury should be prohibited from considering evidence of other crimes unless it, not the trial

---

[21] As noted *ante*, at page 183, footnote 1, defendant's acts against J.S. and S.B. resulted in his guilty plea to burglary only. Charges of robbery, lewd conduct with a child under 14, and oral copulation with a child under 14 were then dropped.

[22] In the reporter's transcript, the phrase *"which involve the express or implied use of force or violence or the threat of force and violence"* is appended to this sentence concerning the robbery of J.S. and could therefore be considered to modify this sentence only. In the clerk's transcript, however, the sentence is set out as if it modifies all five sentences that describe the crimes. Though this latter interpretation was probably intended, and would be consistent with the use of the word "involve" in the plural form, it is nevertheless open to doubt whether the court's instruction informed the jury that only the alleged robbery of J.S. involved force or violence, or whether all five crimes mentioned involved force or violence. We need not resolve this ambiguity, for, as we explain, *post*, the trial court did not err by making a preliminary determination that all five crimes involved force or violence.

court, first determines the conduct involved force or violence, or the threat of force or violence. Here, he argues, "[t]he trial court's instruction . . . answered that very question for the jurors." In so doing, he claims, the factor (b) instruction violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by creating what amounts to a mandatory presumption (see *Carella v. California* (1989) 491 U.S. 263 [105 L.Ed.2d 218, 109 S.Ct. 2419]).

Respondent first contends defendant failed to preserve the constitutional issue because he failed to object on this ground. If, however, defendant is correct that the factor (b) instruction directed a verdict on a point essential to his death penalty judgment, the instruction would have affected a substantial right of his, and section 1259 would permit him to raise the issue on appeal despite failure to object. That section provides in pertinent part: "[T]he appellate court may . . . review any instruction given . . . , even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259.) We conclude the issue is properly before this court.

Turning to the merits, we find the factor (b) instruction did not violate defendant's constitutional rights. We recently addressed and rejected this precise issue: "Defendant contends that [the factor (b)] instruction improperly told the jury that each listed instance of unadjudicated criminal activity actually involved force or violence, thus 'removing that issue from the jury's consideration' and constituting 'a directed verdict on an essential element of the factor (b) finding the jury was to make.' We disagree. . . . [T]he jury was provided the definition of each alleged crime and possible defenses and reminded as well of the prosecution's burden to establish the commission of each crime beyond a reasonable doubt. These instructions 'properly told the jurors that they could consider any of the specified unadjudicated criminal acts as factors in aggravation only if they found beyond a reasonable doubt that defendant had committed the act or activity, and that it involved the use or attempted use or express or implied threat to use force or violence.' (*People v. Sapp* (2003) 31 Cal.4th 240, 314 [2 Cal.Rptr.3d 554, 73 P.3d 433].) . . . [T]he characterization of the remaining acts as involving an express or implied use of force or violence, or the threat thereof, would be a matter properly decided by the court. [Citation.] 'CALJIC No. 8.87 is not invalid for failing to submit to the jury the issue whether the defendant's acts involved the use, attempted use, or threat of force or violence.' " (*People v. Monterroso* (2004) 34 Cal.4th 743, 793 [22 Cal.Rptr.3d 1, 101 P.3d 956], quoting *People v. Nakahara* (2003) 30 Cal.4th 705, 720 [134 Cal.Rptr.2d 223, 68 P.3d 1190].)

Even if the factor (b) instruction was erroneous, there is no reasonable possibility the error resulted in prejudice. Defendant did not challenge or undermine the testimony of J.S. or S.B., introduced no evidence suggesting that in the offenses against them he acted without using force or violence, and stipulated to permitting the jury to consider their testimony at the penalty phase. Any error was harmless under any standard.

### 6. *Challenges to the Death Penalty Law*

Defendant next raises a number of state and federal constitutional challenges to the state's capital sentencing scheme. We have rejected these contentions previously, and defendant does not convince us to revisit those prior decisions. Thus, the penalty judgment is not unreliable, invalid, or unconstitutional because of:

(a) The jury's consideration of prior unadjudicated criminal conduct. (*People v. Koontz, supra*, 27 Cal.4th at p. 1095.)

(b) The failure to instruct the jury it must be unanimous in finding aggravating factors present. (*People v. Weaver, supra*, 26 Cal.4th at p. 992.)

(c) The failure to instruct the jury it must find aggravating factors true beyond a reasonable doubt. (*People v. Boyette, supra*, 29 Cal.4th at p. 465.)

(d) The failure to delete inapplicable factors. (*People v. Maury* (2003) 30 Cal.4th 342, 439–440 [133 Cal.Rptr.2d 561, 68 P.3d 1].)

(e) The use of the phrase "whether or not" in factors (d) through (h) and (j) of section 190.3. (*People v. Kraft, supra*, 23 Cal.4th at pp. 1078–1079.)

(f) The failure to instruct the jury that some factors were mitigating only. (*People v. Jones* (2003) 30 Cal.4th 1084, 1123 [135 Cal.Rptr.2d 370, 70 P.3d 359].)

(g) The failure to instruct the jury on the burden of proof at the penalty phase. (*People v. Smith* (2003) 30 Cal.4th 581, 641–642 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

(h) The failure to require the jury to return explicit findings. (*People v. Coddington, supra*, 23 Cal.4th at p. 656.)

(i) The prosecutor's discretion to decide whether or not to charge a murder as a capital crime. (*People v. Weaver, supra,* 26 Cal.4th at p. 992.)

(j) The failure to require "comparative appellate review," what we normally call intercase proportionality review. (*People v. Weaver, supra,* 26 Cal.4th at p. 992.)

(k) The failure of the law meaningfully to narrow the class of offenders eligible for the death penalty. (*People v. Weaver, supra,* 26 Cal.4th at p. 992.)[23]

(l) The failure to instruct on the presumption of life over death. (*People v. Maury, supra,* 30 Cal.4th at p. 440.)

(m) The use of a unitary list of sentencing factors "without designation of mitigation or aggravation." (*People v. Boyette, supra,* 29 Cal.4th at p. 466.)

(n) The use of "vague" and "unclear" sentencing factors. (*People v. Maury, supra,* 30 Cal.4th at p. 439 [rejecting claim that sentencing factors are "vague"]; *People v. Navarette* (2003) 30 Cal.4th 458, 522 [133 Cal.Rptr.2d 89, 66 P.3d 1182] [rejecting claim that sentencing factors are "unclear"].)

(o) The use of lethal injection as the means of execution. (*People v. Hughes* (2002) 27 Cal.4th 287, 406 [116 Cal.Rptr.2d 401, 39 P.3d 432] [lethal injection is not cruel and unusual punishment].)

(p) The delay between his conviction and decision on appeal. (*People v. Hughes, supra,* 27 Cal.4th at p. 406.)

 We also find *Apprendi v. New Jersey, supra,* 530 U.S. 466, and its progeny (see *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]) are inapplicable to California's capital sentencing scheme. (*People v. Griffin* (2004) 33 Cal.4th 536, 595 [15 Cal.Rptr.3d 743, 93 P.3d 344].)

---

[23] Defendant argues the ballot arguments in favor of Proposition 7, which became the 1978 death penalty law, suggested the proposed new capital punishment law would make "every murderer" eligible for the death penalty, thereby demonstrating that the framers of the 1978 death penalty law did not expect the law to satisfy the constitutionally required narrowing function. He contends we have never addressed the merits of this particular claim. But "it is clear that the argument was merely hyperbole" (*Domino v. Superior Court* (1982) 129 Cal.App.3d 1000, 1010 [181 Cal.Rptr. 486]) or "political rhetoric" (*Carlos v. Superior Court, supra,* 35 Cal.3d at p. 143, fn. 11, overruled on another ground in *People v. Anderson, supra,* 43 Cal.3d 1104).

### 7. *Cumulative Effect of Alleged Errors*

Defendant contends the cumulative effect of the alleged errors by the trial court, the prosecutor, and defense counsel demonstrates he was denied his constitutional rights, requiring we reverse the penalty judgment. Having found no errors, we reject this claim as well.

### III. CONCLUSION

The judgment is affirmed in its entirety.

George, C. J., Kennard, J., Baxter, J., Chin, J., and Moreno, J., concurred.

**BAXTER, J.,** Concurring.—I concur with the majority and have also signed Justice Chin's concurring opinion. To the extent that *People v. Coddington* (2000) 23 Cal.4th 529 [97 Cal.Rptr.2d 528, 2 P.3d 1081], which I authored, suggests that the work product rule would bar a prosecutor from commenting on the defendant's failure to call defense experts who had examined forensic evidence relevant to the case, it merits reexamination. (See *United States v. Grammer* (9th Cir. 1975) 513 F.2d 673, 676.)

**CHIN, J.,** Concurring.—I concur, but I would have preferred the majority explore the question whether one aspect of our decision in *People v. Coddington* (2000) 23 Cal.4th 529, 605–606 [97 Cal.Rptr.2d 528, 2 P.3d 1081], should be reconsidered. *Coddington* suggested that the work product privilege (see Code Civ. Proc., former § 2018) would preclude a prosecutor from even *arguing* that the defendant's failure to call defense experts who had examined forensic evidence at the crime scene logically indicated they had nothing helpful to contribute.

The majority in the present case, without questioning *Coddington*'s analysis, conclude that even if defense counsel should have raised the work product objection, no prejudice ensued in light of the strong evidence of defendant's guilt. (Maj. opn., *ante*, at pp. 208–209.) I joined the majority in *Coddington*, but now I wonder whether its work product analysis was flawed, being directly inconsistent with the general rule that the prosecutor may comment on the defense's failure to call a retained expert or other logical witness to rebut the People's case. (See *People v. Bolden* (2002) 29 Cal.4th 515, 552–553 [127 Cal.Rptr.2d 802, 58 P.3d 931] [jury could consider failure of retained defense expert to testify]; *People v. Wash* (1993) 6 Cal.4th 215, 262–263 [24 Cal.Rptr.2d 421, 861 P.2d 1107] [prosecutor properly commented on defense failure to call expert psychiatric testimony to support claim of suicidal depression during defendant's confession].)

I see nothing in the prosecutor's argument in either *Coddington* or the present case that in any way invaded or infringed the work product or privacy of the defense team. Indeed, it seems quite reasonable and legitimate for the prosecutor to observe that although all the forensic evidence linking defendant to the crimes was passed on to defense experts, none of them was called to contradict the prosecution experts. In some future case, we should consider disapproving *Coddington* on this point.

Baxter, J., concurred.

Appellant's petition for a rehearing was denied October 26, 2005.